FOURTH DIVISION
December 21, 2006

No. 1-05-0813

| | |
|---|---|
| FOREST PRESERVE DISTRICT OF COOK COUNTY, ILLINOIS, an Illinois Special District, | ) ) ) |
| Petitioner-Appellant, | ) Petition For Review ) of Order of The Illinois |
| v. | ) Labor Relations Board ) Case No.  L-CA-3020 |
| ILLINOIS LABOR RELATIONS BOARD, ILLINOIS LABOR RELATIONS BOARD, Local Panel, FRED WICKIZER, Acting Executive Director, JACKIE GALLAGHER, Panel Chairman, DONALD HUBERT, Member, EDWARD E. SADLOWSKI, Member, JOHN L. CLIFFORD, Administrative Law Judge, MICHELE CONTRUPE, Administrative Law Judge, JACALYN J. ZIMMERMAN, General Counsel, STATE AND MUNICIPAL TEAMSTERS, CHAUFFEURS, AND HELPERS, LOCAL 726, and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 726, | ) L-CU-3020 ) ) ) ) ) ) ) ) ) ) ) ) |
| Respondents-Appellees. | ) |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Petitioner Forest Preserve District of Cook County (District) filed a petition

seeking direct review of an order from the Illinois State Labor Relations Board (Board)

finding that the District had committed an unfair labor practice under sections 10(a)(1)

and (a) (4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a) (4)

1-05-0813

(West 2002)).  On appeal, the District contends that the Board exceeded its authority by committing several procedural errors and that the District did not commit an unfair labor practice under the Act where it had no obligation to bargain with respondent State and Municipal Teamsters, Chauffeurs and Helpers Union, Local 726 (Local 726).  For the following reasons, we affirm the Board's determination.

I.  Background

A.  The Charge and Amended Charge

On September 24, 2002, Local 726 filed a charge with the Board (case No. L-CA-03-020), alleging that the District had violated sections 10(a)(1) and (a)(4) of the Act. The charge alleged that on September 16, 2002, the District announced that it was implementing a plan to hire a private contractor to operate and manage the golf courses owned by the District, which would result in the layoff of approximately 97 employees represented by Local 726.  The charge also alleged that the District made the decision to enter the private contract and implemented the decision without notice to and good-faith bargaining with Local 726 regarding the impact of the decision on bargaining unit employees.

On December 6, 2002, Local 726 amended its charge to include claims that in 2001, the District began considering a plan to hire a particular private contractor.  The amended charge also alleged that when Local 726 learned of these plans, it made repeated requests to be involved in the decision-making.  The District did not respond to

Local 726's requests, and on July 9, 2002, the District voted to hire the private contractor. The amended charge also stated that after hiring the private contractor, the District contacted Local 726 to discuss the effects of its decision. On September 16, 2002, the District gave notice that it intended to lay off bargaining unit members employed at the golf courses and driving ranges. On November 17, 2002, between 50 to 60 bargaining unit members were laid off.

The amended charge also alleged that on October 30, 2002, the District announced a proposed budget that included further layoffs, departmental reorganizations and proposals to hire private contractors to perform work that was being performed by bargaining unit members. On November 6, 2002, Local 726 demanded information and bargaining regarding the layoffs, proposed reorganization and any further decision to hire outside vendors. The following day, the District informed Local 726 that its board of commissioners was considering an appropriations ordinance, which would result in layoffs within the bargaining unit. Local 726 repeated its demand for bargaining and emphasized that meaningful bargaining must precede adoption of the budget. On November 21, 2002, the District adopted the budget.

The amended charge also stated that on December 3, 2002, the District informed Local 726 that: (1) it believed the pending grievance regarding privatization of the golf course was not arbitrable because it was not covered by the contract; (2) the District intended to lay off approximately 95 bargaining unit members and all that remained to discuss was the effects of that decision; and (3) by April 1, 2003, the District planned to consolidate two departments and, as a result, terminate 31 employees with the title of

"Forester" and "Woodsman," to create new titles and to allow the terminated employees to apply for those positions.

In the amended charge, Local 726 again alleged violations of sections 10(a)(1) and (a)(4) of the Act and requested an order requiring the District to bargain about its decisions to privatize golf operations, lay off employees, and consolidate departments. Local 726 also requested an order requiring reinstatement and appropriate back pay for all employees injured by the District's failure to bargain and the posting of appropriate notices.

### B. The Memorandums of Understanding

The record shows that the parties' representatives met to discuss the impact of the layoff and reached an agreement. On December 19, 2002, the District executed a memorandum of understanding (MOU I), which Local 726 signed on February 6, 2003. MOU I related "solely to the Reduction in Force necessitated by the privatization of the management, operations and control of the District's Golf Facilities." MOU I also provided that "neither Party waives any previous position on matters affecting the terms and conditions of employment of Local 726 employees, or the right to negotiate on such matters in the future." MOU I also provided that "neither party waives its position regarding the [unfair labor practice] charge Local 726 has filed regarding the District's failure to bargain over the decision to privatize." MOU I also provided severance pay for golf driving range employees, initiated their layoff and recall rights, and established "bumping rights" based on seniority.

On July 22, 2003, Local 726 executed a memorandum of understanding regarding employee layoff and recall (MOU II) and a memorandum of understanding regarding resource technician positions (MOU III). The District executed both MOU II and MOU III on August 8, 2003. MOU II expressly provided that it superceded MOU I. MOU II cited the layoffs and stated that the parties had "engaged in negotiations regarding the impact of these lay-offs [sic] on the bargaining unit and its members." MOU II also required that the District create a single recall list of employees from all layoffs, provided that employees retained recall rights for a maximum of two years, and set out how to deal with various situations involving recalling employees to positions other than the ones they held immediately before being laid off. MOU II provided that upon its execution, Local 726 would withdraw the grievance it had filed on December 18, 2002, regarding the reorganization of the two departments. MOU II also required Local 726 to withdraw "that part of Case No. L-CA-03-020 regarding privatization of the golf course operations." The parties also agreed in MOU II that they would arbitrate whether the District had violated the labor agreement when it privatized the golf courses, and, upon the selection of an arbitrator for that grievance, Local 726 was to dismiss with prejudice a lawsuit it had filed involving that same case.

MOU III concerned the resource technician positions resulting from the reorganization of the two departments and the creation of crews staffed by such technicians. MOU III provided that "the Parties wish to fully and finally settle all disputes between them regarding the reorganization, elimination of positions, unit placement of RT's [Resource Technicians] and Resources Aides, and the hiring of RT's."

1-05-0813

The parties specified how the various still-unfilled resource technician positions would be filled, including the District creating a list of eligible individuals that gave hiring-preference to those already employed in the unit and establishing the rate of pay for that job title. MOU III also recorded that the parties had agreed to include the new resource technician positions in the bargaining unit and to jointly petition the Board to amend the existing unit description. Local 726 was to withdraw its previously filed unit clarification petition in case No. L-UC-03-002 and its grievance regarding the reorganization.

On September 11, 2003, counsel for Local 726 wrote a letter to a Board investigator stating that Local 726 was withdrawing "the portion of this charge related to the privatization of Forest Preserve Golf Courses and the portion related to consolidation of the Conservation and Forestry Departments into a new Resource Management Department." The letter also stated that "[t]his leaves the portion of the charge which alleges that the [District] improperly refused to bargain about the layoff of approximately 95 bargaining unit members on December 31, 2002. The Union requests that the [Board] proceed quickly to issue a Complaint on this remaining allegation."

C. The Complaint

On January 13, 2004, the Board's Acting Executive Director issued a complaint for hearing. The complaint concerned, in part, the District's decision to eliminate two job titles, lay off bargaining-unit employees, and consolidate two departments into one department staffed by non-bargaining unit employees in three new job titles. The

1-05-0813

complaint also included Local 726's allegations that the District failed to provide notice and bargain regarding its decision and that the decision involved wages, hours or working conditions within the meaning of the Act and was therefore a mandatory subject of bargaining. On December 19, 2002, Local 726 filed a petition for amendment or clarification of unit (UC Petition) with the Board (case No. L-UC-03-002), seeking to add the employees in the three new job titles to the existing Local 726 bargaining unit. The petition and complaint were consolidated for purposes of hearing.[1]

On February 10, 2004, the District filed a response to the complaint for hearing and affirmative defenses. In its answer to the complaint, the District admitted the allegation in paragraph 7, which alleged that, "In or before October 2002, the Respondent decided to implement a layoff of unit employees." As an affirmative defense, the District argued that Local 726's charge was rendered moot by two memorandums of understanding between the parties. The District asserted that on February 6, 2003, the parties entered into a "Memorandum of Understanding Relating to the Reduction in Force necessitated by the privatization of the management, operations and control of the

[1] In accordance with MOU III, Local 726 formally withdrew the UC Petition on the day of the hearing and agreed to file the papers for the parties to jointly agree to the addition of the resource technician position to the bargaining unit. On August 6, 2004, ALJ Clifford returned the UC Petition to investigation for action by the Board's Acting Executive Director, who amended the unit to include the title of resource technician on September 20, 2004.

District's Golf Facilities," which gave laid-off employees "bumping rights," two weeks' severance, and payment of accrued vacation and compensatory time. The District also stated that on July 22, 2003, the parties entered into a second agreement, entitled "Memorandum of Understanding Regarding Employee Layoff and Recall," which superceded the first agreement and provided that the parties had engaged in negotiations regarding the impact of layoffs. The District also asserted that the second agreement provided that Local 726 agreed to withdraw "that part of Case No. L-CA-03-020 regarding privatization of the golf course operations."

The District also asserted that the parties agreed in a third agreement, on July 22, 2003, entitled "Memorandum of Understanding Regarding Resource Technician Positions," that "the Parties wish to fully and finally settle all disputes between them regarding the reorganization, elimination of positions, unit placement of [resource technicians] and Resource Aides, and the hiring of [resource technicians]." The District asserted that it fully discharged any bargaining obligation that it may have had by entering into the three memorandum agreements.

On February 16, 2004, shortly before the original date scheduled for the hearing, counsel for Local 726 wrote a letter to counsel for the District in an attempt to "spell out the issues." That letter stated in pertinent part:

"A good starting point is the Amended Charge in this case. We allege that on October 30, 2002, the Employer announced a plan to lay off approximately 95 bargaining unit members at the end of the calendar year. The reason for the lay off was economic, *i.e.*, the Employer's budget

shortfall. We allege that the Union twice demanded to bargain prior to the implementation of the budget and that the District did not respond to these demands. We also allege that when the parties met on December 3, 2002, the Employer announced that the layoff decision had already been made and that the parties should proceed to 'effects bargaining.' I have enclosed a copy of the Amended Charge for your reference.

We think the facts will show: (1) that the parties bargained about the effects and (2) that at no time did the Union waive or withdraw its claim that the decision was made in violation of the law and that appropriate remedies are therefore in order."

On March 10, 2004, the District filed a motion for summary judgment arguing, *inter alia*, that Local 726 waived its right to bargain and that Local 726 had already received its remedy where the parties had engaged in impact bargaining, which resulted in MOUs I, II, and III. The District included the letter written by Local 726's counsel on February 16, 2004, as an exhibit to its motion for summary judgment. In the supporting memorandum accompanying its motion, the District set out that there had been one layoff in three stages: the first stage in November 2002, the second on December 31, 2002, and the third on March 31, 2003. The District identified the issue as being whether Local 726 had unequivocally waived its right to bargain "over the implementation of the second stage of this RIF (Reduction in Force), which became effective on December 31, 2002." Local 726 did not respond to the District's motion for summary judgment, and the Board denied that motion on April 19, 2004.

D.  The Hearing and Amendment to the Complaint

At the hearing on May 13, 2004, administrative law judge (ALJ) Michele N. Cotrupe attempted to set out the issues.  She stated that her understanding of the case included the following issues:

"1.  Whether the Respondent violated section[s] 10(a)(4)

and

(1) of the Act when it implemented a layoff of employees represented by the Charging Party in October, 2002.

2.  Whether the Respondent violated section[s] 10(a)(4) and (1) of the Act when it failed and refused to provide the Charging Party with information that it requested on October 30, 2002.

And, finally, whether the unit description should be revised to include the titles of Resource Manager, Resource Technician and Resource Management Aide."

Following this recitation of the issues, counsel for Local 726 requested to amend the complaint.  Counsel for Local 726 stated, "[w]ith respect to the third issue, on the record today we would like to amend the [unit clarification] petition, per an agreement with the Forest Preserve, to just include the title of Resource Technician."  Counsel for the District stated, "That's fine.  We have no objections."  Counsel for Local 726 also withdrew the second part of the complaint relating to the provision of information.

With respect to the first issue in the complaint, the parties noted that they had reached an agreement with respect to the privatization of the golf courses, which led to

the October layoffs referenced in the complaint. Counsel for Local 726 stated that the complaint should instead reference the layoffs that took place in December 2002 and that she "would like to move on the record to amend the complaint" to include the following: "That on December 31, 2002, the Employer laid off approximately 95 unit employees." Counsel for the District stated that she did not oppose the motion and ALJ Cotrupe agreed that the complaint would be amended. At the conclusion of counsel for Local 726's opening statement, counsel for the District stated:

"The District is going to at this time object to any further proceedings. There has not been a complaint for hearing issued on the December 2002, layoff. The complaint for hearing that's been issued in this case is for October 2002.

The Petitioner has amended his charge to include the December 2002, layoff; however, no complaint for hearing has been issued with respect to the December 2002, layoff."

Counsel for Local 726 responded:

"I want to say one thing about that, in addition to the fact that I've moved to amend the complaint.

If you read the complaint very closely, in Paragraph 7 it says, 'In or before October 2002, the Respondent decided to implement a layoff of unit employees.'

I think the evidence is very clear that the Forest Preserve District was contemplating the layoff of unit employees and, indeed, the layoff that

-11-

was the budgetary layoff in October 2002; and as a consequence, I think, if you read the complaint very closely, there is nothing in the complaint that's inconsistent with dealing with a layoff that occurred after 2002, in either golf or an economic layoff, or in the layoffs that were caused by the merger of the two departments."

Counsel for the District then stated:

"The complaint for hearing that was issued by the Board specifically addresses the October 2002, layoff. It makes no reference whatsoever to a December 2002, layoff. Therefore, that issue is not before the Board at this time, as a complaint for the December 2002, layoff has not been filed by the Board."

ALJ Cotrupe noted that counsel for Local 726 had moved to amend the complaint and allowed Local 726 to proceed with the presentation of its evidence. ALJ Cotrupe also noted that the parties would be allowed to brief whether the complaint should be amended to reflect the December 2002 layoff.

Local 726 called Jim Green to testify on its behalf. Green testified that he had been employed as Local 726's counsel for 10 years and served as chief spokesman during contract negotiations. When Green learned about possible layoffs during the summer of 2002, relating to the District's golf courses, Green testified that Local 726 demanded to meet with the District and filed a grievance. Local 726 demanded to bargain about the District's decision to lay off employees, but the District's position was that it did not have to bargain over that issue. Green testified that the parties did bargain over the

effects of the layoffs and reached an agreement on November 1, 2002, which was memorialized in a memorandum of understanding dated November 4, 2002.

Green testified that the secretary-treasurer for Local 726 subsequently showed him a press release from the District's website. Sometime after October 30, 2002, Green downloaded the press release from the District's website, which set out highlights from the District's proposed 2003 budget, including the combination of two existing departments into one and the elimination of 473 positions. Green testified that at the time, there were also articles in newspapers regarding the budget and potential layoffs and reductions. Green also testified that shortly thereafter, Local 726 received a "Notice of Proposed Reduction in Work Force" from the District, which was dated November 4, 2002.

Green also testified that after the District refused to bargain about its decision to privatize the golf courses, Local 726 filed an unfair labor practice charge. After the announcement of the subsequent budgetary layoffs, Green directed another attorney for Local 726 to write a letter objecting to that action, demanding to meet with the District, and demanding rescission or postponement pending bargaining of that action. Such a letter was issued by an attorney for Local 726 on November 6, 2002, but Green testified that the District did not respond to the letter. Green testified that an attorney for Local 726 issued a follow-up letter on November 20, 2002, which was during the time that the proposed budget was in the process of being adopted by the District.

Green testified that after the budget had been adopted, the parties began to meet on December 3, 2002, regarding the effect of that budget on bargaining unit employees.

1-05-0813

Green testified that the District refused to bargain with respect to Local 726's demand that the District rescind its action and postpone the layoffs pending bargaining about the decision. The District then sent out a "Notice to Employee" to employees that potentially were to be laid off, advising that "[t]here are plans to have a reduction in force (Layoff) in late December." Notices to individuals of termination of services effective December 31, 2002, were issued by the District on December 4, 2002.

Green testified that the parties met again to bargain about the effects of the layoff due to the District's reduced budget in late December 2002, and continued to bargain into January and February 2003. Green testified that the parties also began bargaining about the effect of the reorganization of the other department. Green testified that the parties entered into a memorandum of understanding, which set forth the process by which people would be recalled, what rights they would have to bump to a different position, and the amount of time that they would retain those rights. Green testified that the parties also entered into a memorandum of understanding regarding the effects of the reorganization of the two departments into one, which included that the newly created job title would be under Local 726's jurisdiction. Green testified that the parties never bargained about the District's decision to have the layoffs. Green testified that the District made it clear that it would not bargain over its decision and Local 726 made it clear that it would bargain about the effects, but would not in any way waive its position that the District was required to bargain about the decision.

During cross-examination, Green testified that the collective bargaining agreement between the District and Local 726 contained a "management rights" clause.

-14-

1-05-0813

The record shows that the collective bargaining agreement between the parties was effective from January 1, 2000, through December 31, 2002. The "management rights" clause in article II, section 1, of the agreement provides:

"The Union recognizes that the District has the full authority and responsibility for directing its operations and determining policy. The District reserves unto itself all powers, rights, authority, duties and responsibilities conferred upon it and vested in it by the statutes of the State of Illinois, and to adopt and apply all rules, regulations and policies as it may deem necessary to carry out its statutory responsibilities; provided, however, that the District shall abide by and be limited only by the specific and express terms of this Agreement, to the extent permitted by law."

Green testified that he did not recall the management rights clause being mentioned during negotiations. Green testified that if the parties had agreed on a layoff provision during contract negotiations, they could have put that agreement in the collective bargaining agreement. Green also testified that the collective bargaining agreement did not contain some of the topics addressed in the memorandum of understanding regarding employee layoff and recall.

The District called its chief financial officer, Barbara McKinzie, to testify concerning the District's budgetary constraints. She testified that the District was legally required to have a balanced budget and that tax caps enacted in 1995 limited increases in its income and capped infrastructure debt. McKinzie testified that the income for each fiscal year lagged by 12 to 24 months, and therefore the budget had to be balanced based

-15-

on expected income. McKinzie testified that the District received its revenue in two installments, with the first one in March. McKinzie testified that because the District used "seasonal help" to cover the heavy peak time between May and October, the District's expenses would go up a lot while it was not getting any revenue and that it would receive the second installment of income after the season was theoretically over.

McKenzie also testified that, in 2001, the District's board passed a resolution that "went on record with a policy *** that there would not be borrowing anymore." McKinzie subsequently joined the District in February 2002. McKenzie testified that an audit through 2001 showed that, for a number of years, the District had been spending more money than it had received in revenues. McKenzie testified that the "first step in the budget would be to get the managers to determine how they can operate and reduce cost to mirror what we were taking in." McKenzie testified that the District had a $2 million deficit in 2001, but that the District did not fill all budgeted positions and made an effort to cut costs in 2002, resulting in no deficit in 2002. McKenzie also testified that due to an adjustment in accounting procedures, the District's balance at the end of 2002 showed a $2 million increase in debt. McKenzie testified that the District took steps to reduce the deficit in the 2003 budget. McKenzie testified that in 2002, when she arrived, the Board had decided to privatize its golf courses and proposed an overall reduction in operations within the District.

The District also called Jonathan Rothstein to testify. Rothstein testified that he was an attorney representing the District during its negotiation of the collective bargaining agreement with Local 726. Rothstein testified that the collective bargaining

agreement did not contain layoff provisions and stated that it was not a subject of negotiations. Rothstein testified that the agreement had a provision addressing when seniority rights could be terminated. Rothstein also testified that all employees in the resource technician job classification had previously been in forestry positions.

Following the hearing, ALJ Cotrupe resigned her position with the Board and ALJ John Clifford was assigned to this case. ALJ Clifford notified the parties of his assignment on or around June 28, 2004, and the record does not reflect that either party objected to that assignment. On August 30, 2004, ALJ Clifford issued a recommended decision and order, in which he granted Local 726's motion to amend the complaint. In doing so, ALJ Clifford found that as late as February 2004, both parties assumed that paragraph 7 of the complaint referred to the District's decision in October 2002 to implement a December 2002 layoff. ALJ Clifford stated, "The amendment merely clarifies the original allegation and arises out of the same subject matter, as it merely adds that the October 2002 decision to implement a layoff resulted in the December 2002 layoff. Although Local 726's proposed amendment adds nothing to paragraph 7 as originally understood, I grant it to avoid any confusion."

ALJ Clifford found that the District's decision to implement a layoff for budgetary reasons was a mandatory subject of bargaining and that Local 726 did not, in bargaining with the District, waive its right to bargain about the budgetary layoff. ALJ Clifford found that the District violated sections 10(a)(1) and (a)(4) of the Act by failing and refusing to bargain with Local 726 over its October 2002 decision to lay off employees in December 2002.

1-05-0813

On October 6, 2004, the District filed exceptions to ALJ Clifford's recommended decision and order. On March 5, 2005, the Board affirmed the ALJ's decision and, *inter alia* ordered the District to: (1) reinstate the laid off employees and make them whole; (2) on request, bargain collectively with Local 726 about the decision; (3) post notices; and (4) notify the Board of its actions. The District appeals from the Board's determination.

II. Analysis

A. The District's Procedural Arguments

The District raises several arguments that the Board exceeded its authority during the proceedings. "Pursuant to the Act, judicial review of the Board's decision is limited and governed by the Administrative Review Law (735 ILCS 5/3-110; 5 ILCS 315/11(e) (West 2002))". City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 204 (1998). When reviewing proceedings under the Administrative Review Law, this court must determine whether the procedures required by law were taken by the administrative agency and, if so, whether the decision of the agency was against the manifest weight of the evidence. Metz v. Illinois State Labor Relations Board, 231 Ill. App. 3d 1079, 1093 (1992). An administrative agency's factual determinations are contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident. City of Belvidere, 181 Ill. 2d at 205. The reviewing court also has a duty to examine the procedural methods employed at the administrative hearing to ensure that a fair and impartial procedure was used. Anderson v. Human Rights Comm'n, 314 Ill. App. 3d 35, 41 (2000).

1-05-0813

1. The District's Argument That All Charges in the Complaint Were Settled

The District first contends that the Board erred by conducting a hearing where the matters raised in the complaint had been resolved by the various memorandums of understanding entered into by both parties. Contrary to the District's contention, nothing in the three MOUs states that Local 726 was to withdraw its charge and amended charge so far as it concerned an alleged violation by the District to bargain over the October 2002 decision to lay off individuals that resulted in the December layoffs. While the MOUs stated that various other aspects of the allegations were to be withdrawn, they did not include the October 2002 decision to lay off individuals.

In addition, Local 726 clarified that it was continuing to pursue this issue in its letter to a Board investigator on September 11, 2003. In that letter, counsel for Local 726 stated that Local 726 was withdrawing "the portion of this charge related to the privatization of Forest Preserve Golf Courses and the portion related to consolidation of the Conservation and Forestry Departments into a new Resource Management Department." The letter also stated that "[t]his leaves the portion of the charge which alleges that the [District] improperly refused to bargain about the layoff of approximately 95 bargaining unit members on December 31, 2002."

Further, on February 16, 2004, counsel for Local 726's letter to counsel for the District stated that its amended charge alleged that on October 30, 2002, the District announced a plan to lay off approximately 95 bargaining unit members at the end of the calendar year for economic reasons. Counsel for Local 726 also stated that while the

parties met to bargain about the effects of the layoff, "at no time did the Union waive or withdraw its claim that the decision was made in violation of the law."

### 2. Local 726's Amendment to the Complaint

The District also contends that the Board exceeded its authority in granting Local 726's motion to amend the complaint where none of the requirements for allowing amendments are present in this case. We disagree.

Section 11(a) of the Act provides that "[a]ny such complaint may be amended by the member or hearing officer conducting the hearing for the Board in his discretion at any time prior to the issuance of an order based thereon." 5 ILCS 315/11(a) (West 2002). Under section 1220.50(f) of the Rules and Regulations of the Illinois Labor Relations Board (Rules) (80 Ill. Admn. Code, amended at 27 Ill. Reg. 7436 (eff. May 1, 2003) § 1220.50(f)), "[t]he Administrative Law Judge, on the judge's own motion or on the motion of a party, may amend a complaint to conform to the evidence presented in the hearing or to include uncharged allegations at any time prior to the issuance of the Judge's recommended decision and order." The Board's case law provides two specific instances in which a complaint may be amended: "(1) where, after the conclusion of the hearing, the amendment would conform the pleadings to the evidence and would not unfairly prejudice any party; and (2) to all allegations not listed in the underlying charge, so long as the added allegations are closely related to the original charge, or grew out of the same subject matter during the pendency of the case." Service Employees International Union, Local 73 v. Village of Wilmette, 20 Pub. Employee Rep. (Ill.) Par. 85, Nos. S-CA-01-231, S-CA-01-233, S-CA-02-125 (May 14, 2004).

Here, we find that the ALJ properly allowed Local 726 to amend the complaint where the amendment merely clarified the original allegation and arose out of the same subject matter as the original allegation. The record showed that as late as February 2004, when counsel for Local 726 wrote a letter to the District's counsel, the parties assumed that paragraph 7 of the complaint referred to the District's decision in October 2002 to implement a December 2002 layoff. The amendment merely added that the October 2002 decision resulted in the December 2002 layoff. The amendment made clear what the complaint intended and what the parties understood it to mean prior to the hearing.

The District further argues that the ALJ was required to conduct a new investigation prior to amending the complaint because the December 2002 layoff was a new untimely charge. However, we reject the District's argument where, as previously discussed, the amendment did not constitute a new charge, but rather clarified the complaint in this case.

3. The District's Argument that Only ALJ Cotrupe Was Permitted to Amend the Complaint and Issue the Recommended Decision and Order

The District argues that as the judge who conducted the hearing, only ALJ Cotrupe had the authority to amend the complaint. In his recommended decision and order, ALJ Clifford found that "the proposed amendment adds nothing to paragraph 7 as originally understood" and "grant[ed] it to avoid any confusion." However, the

record shows that during the hearing, ALJ Cotrupe did grant Local 726's amendment to the complaint then later stated that she would allow the parties to submit further briefs on the issue. The following exchange took place during the hearing:

"[Counsel for Local 726]: Let's do it this way: I would like to move on the record to amend the complaint, and my proposed amendment is the following: ***

[A]dd to paragraph 7 the sentence, 'That on December 31, 2002, the Employer laid off approximately 95 unit employees.'

***

[Counsel for the District]: If that's his amendment, that's his amendment.

[ALJ Cotrupe]: Do you oppose it?

[Counsel for the District]: Oppose him amending? He's going to refile anyway. So no, I don't oppose. There is no sense in prolonging it.

[ALJ Cotrupe]: Okay. Then the complaint will be amended."

Contrary to the District's contention, ALJ Cotrupe did permit Local 726 to amend the complaint.

The District also contends that ALJ Clifford had no authority to issue his order granting the amendment simultaneously with his recommended decision and order. The District argues that it was deprived of its right to file a written response to the decision to amend the complaint.

Section 11(a) provides that "[t]he person who is the subject of the complaint has

the right to file an answer to the original or amended complaint and to appear in person or by a representative and give testimony at the place and time fixed in the complaint." 5 ILCS 315/11(a) (West 2002). Here, the District's counsel was present at the hearing and presented testimony and other evidence. Counsel was not precluded from filing an answer to the amendment, but waived his objection to the amendment by stating "I don't oppose." The District also notes that it was able to brief the issue relating to the amendment in its closing brief. Therefore, the District was not prevented from presenting its position in this case.

The District further argues that ALJ Clifford lacked the authority to issue his recommended decision and order where he was not the ALJ who conducted the hearing. Our supreme court has held that, in the absence of statutory provisions to the contrary:

"'[I]t is not necessary that testimony in administrative proceedings be taken before the same officers who have the ultimate decision-making authority. [Citations.] *** [A]dministrative proceedings may be conducted by hearing officers who refer the case for final determination to a board which has not "heard" the evidence in person. The requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determination thereon. [Citations.]'" Starkey v. Civil Service Comm'n, 97 Ill. 2d 91, 100 (1983), quoting Homefinders Inc. v. City of Evanston, 65 Ill. 2d 115, 128 (1976).

This court has also found that the requirements of procedural due process are also met, under the Act, when a substituting hearing officer bases his decision not only on the evidence presented before him but also on the evidence contained in the report of proceedings before a prior hearing officer. North Shore Sanitary District v. Illinois State Labor Relations Board, 262 Ill. App. 3d 279, 295 (1994).

Here, ALJ Clifford considered the evidence presented to him as well as the evidence presented to ALJ Cotrupe during the hearing. In addition, neither party objected to ALJ Clifford's assignment to this case after ALJ Cotrupe left the Board's employ. ALJ Clifford also noted in his recommended decision and order that he was unable to discern any credibility issues in this case. See North Shore Sanitary District, 262 Ill. App. 3d at 295 (where credibility is a determining factor in a case, the presiding hearing officer must participate in the decision). Therefore, the fact that ALJ Clifford, rather than ALJ Contrupe, made the ultimate recommended decision to the Board is inconsequential.

The District, nonetheless, cites Gilchrist v. Human Rights Comm'n, 312 Ill. App. 3d 597 (2000), in support of its argument that ALJ Clifford lacked the authority to issue the recommended decision and order in this case. We find Gilchrist to be distinguishable. In Gilchrist, this court found that the Human Rights Commission exceeded its authority where its determination failed to meet the specific requirements of the Illinois Human Rights Act. This court held that the statutory requirement that the presiding hearing officer transmit his or her impression of witness credibility to the hearing officer who authors the findings and recommended order was not met. This

court also found that the requirement, under the Human Rights Act, that there be no questions of witness credibility presented by the record as found by the presiding officer was not met. Unlike Gilchrist, the ALJ in this case was not bound by the specific requirements under the Human Rights Act. In addition, we agree with ALJ Clifford's determination that there were no credibility issues present in this case.

4. The District's Affirmative Defenses and Motion for Summary Judgment

The District next contends that because Local 726 did not respond to its affirmative defenses and motion for summary judgment, the District's affirmative defenses should have been deemed admitted and the complaint should have been dismissed or the District's motion for summary judgment should have been granted. The District argues that where the Board's rules are silent, the Board should have applied provisions of the Illinois Code of Civil Procedure to find that the District's affirmative defenses are admitted.

Under the Act, the Board has the obligation to promulgate "procedural rules and regulations which shall govern all Board proceedings." 5 ILCS 315/5(I) (West 2002). Pleading before the Board in unfair labor practice proceedings is governed not by the Illinois Code of Civil Procedure (Code) (735 ILCS 5/1-101 et seq.) (West 2002)), but rather by the Board's Rules (80 Ill. Adm. Code §§ 1200 through 1240) amended at 27 Ill. Reg. 7436 (eff. May 1, 2003). General Service Employees Union, Local 73, 3 Public Employee Rep. (Ill.) Par. 3030, Nos. L-CA-87-200, L-CA-87-205 (September 21, 1987), International Brotherhood of Electrical Workers, Local 193, Public Employee Rep. (Ill.) Par. 2024, No. S-CA-92-104 (April 30, 1993). This court has also noted that the Code's

provisions generally do not apply to administrative proceedings. See Jones v. Department of Human Rights, 162 Ill. App. 3d 702 (1987); Desai v. Metropolitan Sanitary District of Greater Chicago, 125 Ill. App. 3d 1031 (1984). This is because administrative procedure is simpler, less formal and less technical than judicial procedure. Desai, 125 Ill. App. 3d at 1033.

Also, pursuant to the Board's Rules, once the complaint for hearing is issued in an unfair labor practice proceeding, the charging party is not required to file anything. Section 1220.40(b) of the Rules provides in pertinent part:

"(b) Whenever the Executive Director issues a complaint for hearing, the respondent shall file an answer within 15 days after service of the complaint and deliver a copy to the charging party by ordinary mail to the address set forth in the complaint. ***

*** 

(2) The answer shall also include a specific, detailed statement of any affirmative defenses." 80 Ill. Adm. Code § 1220.40(b)(2), amended at Ill. Reg. 7436 (eff. May 1, 2003).

Contrary to the District's contention, the Rules are not silent on the matter of affirmative defenses. Rather, section 1220.40(b)(2) of the Rules compels a respondent to file an answer to the complaint and include in the answer any affirmative defenses. However, there is nothing in the Rules stating that a charging party, such as Local 726, must then respond to the affirmative defenses. There is also no provision for a respondent to file any motion or pleading, other than an answer, when served with a complaint. The Rules

do not provide that if a charging party declines to file a response to a respondent's affirmative defenses or summary judgment motion, it will be subject to default judgment.

Further, the standard for granting summary judgment is not whether a party filed a response but whether the right of the moving party is clear and free from doubt. Midfirst Bank v. Abney, 365 Ill. App. 3d 636, 643 (2006). "Summary judgment is appropriate only where 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " Midfirst Bank, 365 Ill. App. 3d at 643, quoting 735 ILCS 5/22-1005(c)(West 2002). When a motion for summary judgment is unopposed, the court must nonetheless conduct an examination to determine whether the moving party is entitled to summary judgment. Midfirst Bank, 365 Ill. App. 3d at 643. For these reasons, we reject the District's argument that its affirmative defenses should have been deemed admitted and motion for summary judgment should have been granted against Local 726.

### B. Mandatory Subject of Bargaining

The District next contends that its refusal to bargain with Local 726 regarding the December 2002 layoff did not constitute an unfair labor practice in violation of section 10 of the Act (5 ILCS 315/10 (West 2002)) where the burden on the District to bargain over the layoff outweighed any benefits to Local 726 and, therefore, was not a mandatory subject of bargaining.

Section 10 of the Act provides in pertinent part:

"(a) It shall be an unfair labor practice for an employer or its agents:

(1) to interfere with, restrain or coerce public employees in

the exercise of the rights guaranteed in this Act or to dominate

or interfere with the formation, existence or administration of

any labor organization or contribute financial or other support

to it ***;

***

(4) to refuse to bargain collectively in good faith with a labor

organization which is the exclusive representative of public

employees in an appropriate unit ***." 5 ILCS 315/10(a)(1),

(a)(4) (West 2002).

In resolving whether the District committed an unfair labor practice in violation of these sections, this court must determine whether the District had a mandatory duty to bargain collectively with Local 726 regarding the December 2002 layoff.

Before addressing the merits of this issue, we must first address the applicable standard of review. The issue of whether a public employer is required to bargain over a specific subject generally involves a mixed question of law and fact, and the applicable standard of review is "clearly erroneous." City of Belvidere, 181 Ill. 2d at 205. In City of Belvidere, our supreme court explained that the term "wages, hours, and other conditions of employment" is a legal term that requires interpretation and found that the Illinois State Labor Relations Board's determination whether the matter was a mandatory bargaining subject

involved the factual consideration of whether the bargaining subject in question affected "wages, hours, and other conditions of employment." City of Belvidere, 181 Ill. 2d at 205.

Under the clearly erroneous standard of review, an agency's decision will be reversed only where the reviewing court, on the entire record, is " 'left with the definite and firm conviction that a mistake has been committed.' " AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 395 (2001), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948). Our supreme court has also stated that, notwithstanding the clearly erroneous standard of review, an agency's factual findings should be afforded a great deal of deference and will not be reversed on appeal unless such findings were against the manifest weight of the evidence. City of Belvidere, 181 Ill.2d at 205. We can now turn to the merits of this appeal.

The Act imposes a duty on a public employer, such as the District, to engage in good-faith collective bargaining with its employees' representative under certain circumstances. Pursuant to section 7 of the Act, an employer has a duty to bargain over issues which affect "wages, hours, and other conditions of employment." 5 ILCS 315/7 (West 2002). Section 4 of the Act further provides in part: "Employers shall not be required to bargain over matters of inherent managerial policy ***. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment." 5 ILCS 315/4 (West 2002).

Oftentimes, however, an issue affects both the conditions of employment and management's inherent authority. In such a "hybrid" situation, the determination of whether the employer must collectively bargain can only be resolved by weighing the benefits of

bargaining with the burdens on management. Central City Education Association v. Illinois Educational Labor Relations Board, 149 Ill. 2d 496, 523 (1992).

In Central City, our supreme court set forth a three-part test for determining whether a matter is a mandatory subject of bargaining. Pursuant to the Central City test, a matter is a mandatory subject of bargaining if it: (1) concerns wages, hours, and terms and conditions of employment; and (2) is either not a matter of inherent managerial authority; or (3) is a matter of inherent managerial authority, but the benefits of bargaining outweigh the burdens bargaining imposes on the employer's authority. Central City, 149 Ill. 2d at 523. Whether a matter concerns wages, hours, and terms and conditions of employment is a question that the administrative agency "is uniquely qualified to answer." Central City, 149 Ill. 2d at 523.

Here, the Board relied on this court's decision in American Federation of State, County & Municipal Employees v. State Labor Relations Board, 274 Ill. App. 3d 327 (1995) (AFSCME), in determining that the December 2002 layoff was a mandatory subject of bargaining. In AFSCME, this court recognized that the employer's decision to lay off employees was inextricably connected with the terms and conditions of employment, but that it also involved a matter of inherent managerial authority. In that case, this court noted that the reduction in force was motivated primarily, if not exclusively, by economic constraints resulting from a shortfall in the employer's budget and that matters relating to overall budget are within the scope of managerial policy. This court concluded:

"[A]fter weighing the benefits and burdens, it becomes clear that a decision to layoff employees due to a decrease in State funding truly invites the use of the collective bargaining process. *** [A] bargaining representative is frequently in the best position

to provide alternatives which may alleviate economic conditions and avoid employee
layoffs. Not only is the representative authorized to negotiate on behalf of the
employees, but he or she often possesses information which may not be available to
management and which could influence management's decision to reduce its force."

AFSCME, 274 Ill. App. 3d at 333.

This court also found that the purported burdens upon management were illusory and affirmed
the State Labor Relations Board's determination that the layoff was a mandatory subject of
bargaining.

Here, the Board determined that the December 2002 layoff was a mandatory subject of
bargaining based on this court's analysis in AFSCME. The District argues that the Board
erred by failing to apply the Central City test to this case and failing to weigh the benefits and
burdens of bargaining in this case. However, both parties acknowledged that the lay off was
connected with the terms and conditions of employment and that it also involved a matter of
inherent managerial authority. Contrary to the District's assertion, the Board did conduct a
benefit and burden analysis of bargaining. The Board agreed with ALJ Clifford's determi-
nation that the District violated sections 10(a)(1) and (c)(4) of the Act. In his recommended
decision and order, ALJ Clifford specifically included the benefits of bargaining regarding
layoffs, as this court discussed in AFSCME. ALJ Clifford also rejected the District's
asserted burdens that bargaining would impose upon it. ALJ Clifford determined that the
District's asserted budgetary problems were not so immediate that bargaining could not have
occurred. ALJ Clifford noted that the District was aware of budgetary issues in February
2002 when it hired a new chief financial officer and adopted a policy to have a balanced

budget and not borrow funds. The District also announced its plans in October 2002, which included the December 2002 layoff. Therefore, the District had time to bargain. Accordingly, we find that the Board properly determined that the District's decision involved a mandatory subject of bargaining and that the District committed an unfair labor practice in violation of sections 10(a)(1) and (a)(4) of the Act.

The District, nonetheless, cites Chicago Transit Authority v. Amalgamated Transit Union, Local 241, 299 Ill. App. 3d 934 (1998) (CTA) in support of its argument that the December 2002 layoff was not a mandatory subject of bargaining where Local 726 did not present any evidence relating to the benefits of bargaining. In CTA, this court upheld the Board's determination that the CTA's decision to reclassify job positions was not a mandatory subject of bargaining. In CTA, the Board found that the union that filed the unfair labor practice charge " 'presented no evidence or legal argument to demonstrate that the benefits of bargaining over the particular reclassification decision *** outweighed the burdens that bargaining would impose on CTA's authority to administer its position classification system.' " CTA, 299 Ill. App. 3d at 939. Unlike CTA, in this case, the Board relied on legal arguments regarding the benefits of bargaining relating to layoffs, as this court discussed in AFSCME. The Board also rejected the District's asserted burdens that bargaining would impose upon it. We find no error in the Board's application of the Central City test, where it considered the benefits and burdens of bargaining.

The District also contends that, even if its decision was a mandatory subject of bargaining, Local 726 waived any right to bargain about the decision to conduct a layoff.

A party to a collective bargaining agreement may waive its rights to bargain under the Act where the contractual language evinces an unequivocal intent to relinquish such rights. AFSCME, 274 Ill. App. 3d at 334. However, evidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable. The language sustaining the waiver must be specific and waiver is never presumed. AFSCME, 274 Ill. App. 3d at 334.

We find that no clear and unmistakable intent to waive rights to bargain exists in this case. The District points to the management rights clause of the collective bargaining agreement as reserving the District's right to lay off employees. However, that clause does not mention layoffs or reductions in force. The District cites AFSCME in support of its argument that such clauses can constitute waiver, but in that case it was critically important that the clause expressly included as management functions the right " 'to relieve employees from duty because of lack of work or other legitimate reasons; [and] to determine the size and composition of the work force.' " AFSCME, 274 Ill. App. 3d at 334-35. No such language appears in the collective bargaining agreement in this case. The District has therefore failed to demonstrate that the contractual provisions constitute "clear and unmistakable" evidence of waiver.

The District further argues that by engaging in impact bargaining and accepting the benefits of the MOUs, Local 726 waived its right to bargain regarding the District's decision to implement layoffs in December 2002. However, the first MOU expressly dealt only with the golf and driving range privatization. It also included a statement that "neither party waives any previous position on matters affecting the terms and conditions of employment of Local 726 employees, or the right to negotiate on such matters in the future." The second

MOU explicitly stated that the parties wished to resolve "certain of these matters" and the third MOU stated that the parties wished to settle "all disputes between them regarding the reorganization, elimination of positions, unit placement of RT's and Resource Aides, and the hiring of RT's." No waiver is clear and unmistakable on the face of these documents. In addition, the second and third MOUs were entered into after Local 726 filed its charge about the decision to lay off employees in December 2002, yet nothing in the MOUs required Local 726 to withdraw that aspect of the charge although Local 726 was required to withdraw other portions of the charge.

Further, there is no evidence that the District's representatives offered to bargain or attempted to bargain about Local 726 waiving any right to bargain about the District's decision. The evidence showed that the District's representatives refused to bargain about the decision to lay off employees in December 2002. Local 726's counsel, Green, testified that the parties never bargained about the District's decision to have the layoffs and that Local 726 made it clear that it would bargain about the effects, but would not in any way waive its position that the District was required to bargain about the decision. Green also testified that he did not recall the management rights clause being mentioned during negotiations and that if the parties had agreed on a layoff provision during contract negotiations, they could have put that agreement in the collective bargaining agreement. For these reasons, we conclude that the evidence fails to demonstrate that Local 726, in a clear and unmistakable manner, waived its right to bargain about the decision to conduct the December 2002 layoff.

### C.  Local 726's Unit Clarification Petition

The District lastly contends that the Board should not have amended the description of the bargaining unit because Local 726 had agreed to withdraw its UC Petition.

The record shows that on September 20, 2004, the Acting Executive Director issued an order and certification of clarified unit in case No. L-UC-03-002, which added the District's newly created title of Resource Technician to the existing historical bargaining unit represented by Local 726.  The record also shows that in MOU II, the District and Local 726 agreed that "the Union will withdraw its pending UC petition before the ILRB, Case No. L-UC-03-002."  However, in that same memorandum of understanding, the parties also agreed that  "[t]he RT [resource technician] position will be added to the bargaining unit and the Parties agree to take all steps necessary to accomplish this accretion, including jointly petitioning the ILRB, if necessary, for an amendment to the existing unit description."  Also, at the hearing, counsel for Local 726 stated: "With respect to the third issue, on the record today we would like to amend the UC petition, per an agreement with the Forest Preserve, to just include the title of Resource Technician."  Counsel for the District then responded, "That's fine.  We have no objections."  Accordingly, the District is precluded from arguing that the Board erred in amending the bargaining unit description on appeal.

### III.  Conclusion

For the above-stated reasons, we affirm the Board's determination that the District's decision to layoff employees was a proper subject for mandatory bargaining, that Local 726

did not waive bargaining over that issue, and that the District committed an unfair labor practice under sections 10(a)(1) and (4) of the Act by failing to comply with bargaining requirements.

Affirmed.

CAMPBELL and NEVILLE, JJ., concur.