# Illinois Official Reports

## Appellate Court

---

***International Brotherhood of Teamsters, Local 700 v. Illinois Labor Relations Board, Local Panel*, 2017 IL App (1st) 152993**

---

| | |
|---|---|
| Appellate Court Caption | INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 700, Petitioner-Appellant, v. THE ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL, THE COUNTY OF COOK, and SHERIFF OF COOK COUNTY, as Joint Employers, and ILLINOIS FRATERNAL ORDER OF POLICE LABOR COUNCIL, Respondents (Illinois Labor Relations Board, Local Panel, County of Cook, and Sheriff of Cook County, as Joint Employers, Respondents-Appellees). |
| District & No. | First District, First Division<br>Docket No. 1-15-2993 |
| Filed<br>Modified upon denial<br>of rehearing | February 21, 2017<br><br>March 31, 2017 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, Local Panel, No. L-CA-13-055. |
| Judgment | Reversed in part; affirmed in part. |
| Counsel on Appeal | Cass T. Casper and Nicole L. Chaney, of Teamsters Local 700, of Park Ridge, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield, and Kimberly M. Foxx, State's Attorney, of Chicago (David L. Franklin, Solicitor General, and Aaron T. Dozeman, Assistant Attorney General, and Donald J. Pechous, Patricia M. Fallon, and Andrew J. Creighton, Assistant State's Attorneys, of counsel), for appellees. |

PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Harris and Mikva concurred in the judgment and opinion.


# OPINION

¶ 1        Petitioner, the International Brotherhood of Teamsters, Local 700 (Union), appeals from a decision and order of the Illinois Labor Relations Board, Local Panel (Board), that upheld two general orders issued by respondents, the County of Cook and the Sheriff of Cook County. In relevant part, the first general order—known as the Gang Order—prohibits employees from associating with anyone the employee knew or should have known is or was in a gang and requires employees to complete a disclosure form about gang affiliations. The second general order—known as the Rules of Conduct Order—provides in part that the rules for on- and off-duty conduct extend to social media and networking sites. On appeal, the Union contends that the Gang Order was a subject of mandatory bargaining and the social media policy in the Rules of Conduct Order is overbroad under section 10(a)(1) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1) (West 2012)). We reverse the Board's decision as to the Gang Order and affirm the Board's decision as to the Rules of Conduct Order.

¶ 2                                    I. BACKGROUND
¶ 3        During the relevant time period, the Union was the exclusive representative of the correctional officers, deputy sheriffs, and fugitive investigators bargaining units.[1] The Gang Order and Rules of Conduct Order, which applied to employees of the Cook County sheriff's office (CCSO), were issued on January 18, 2013, and had effective dates of January 25, 2013. The Gang Order (order No. 11.2.21.0) has eight sections that are marked with roman numerals. Sections I-IV are not directly at issue, but parts of those sections provide helpful background. In relevant part, section II states that "[c]riminal organizations and street gangs pose a substantial threat to the public and directly impede the efforts of the CCSO to provide for public safety." Section III provides in part that "[a]ny violation of this order may result in denial of access to the CCSO; disciplinary action up to and including termination; and/or criminal charges where applicable." Beginning with section V, the Gang Order states:

> "*V. DEFINITIONS*
>
>     A. Known Criminal Organization—A group of persons (such as a street gang) who form an allegiance for a common purpose, who engage in criminal activity, and who conform to one or more of the following traits:
>
>         1. Share a common group name.
>         2. Share common symbols, tattoos, or graffiti.
>         3. Share a common style of dress.
>         4.  Frequently congregate upon, or lay claim to, a geographic
>     location.

---

[1] Before the Board issued its decision, the Illinois Fraternal Order of Police Labor Council was allowed to intervene as the exclusive representative of the Deputy Sheriffs.

5. Associate together on a regular or continuous basis.

B. Known Criminal Organization Member—Any person who has adopted, connected, associated, participated, affiliated with, or been a member of any known criminal organization.

C. Family Relationship—For the purpose of this order, Family Relationship shall include: spouse, parents, children, stepchildren, siblings; other persons related by blood or by present or prior marriage; legal guardians/wards; persons who share or formerly shared a common dwelling; persons who have or allegedly have a child in common; persons who share or allegedly share a blood relationship through a child; persons who have or have had a dating or engagement relationship; relationships with personal assistants and/or caregivers, personally or for any other family member or relationship.

D. Association—A coming together and social interaction between individuals.

## VI. PROHIBITIONS

The following activities are specifically prohibited by this order:

A. Membership in any Known Criminal Organization identified by the Sheriff's Office Intelligence Center (SOIC) as a criminal organization.

B. Association with any member of a Known Criminal Organization provided that:

1. The employee knew or should have known that the person with whom the employee associates is or was a member of a Known Criminal Organization; or

2. The employee has previous been ordered by the CCSO to cease associating with a person(s) identified by SOIC as a member of a Known Criminal Organization.

## VII. RESPONSIBILITIES

A. CCSO employees shall:

1. Not be members of Known Criminal Organizations.

2. Not associate with Known Criminal Organization Members.

* * *

## VIII. KNOWN CRIMINAL ORGANIZATION/GANG MEMBERSHIP DISCLOSURE

A. All CCSO employees and any individuals allowed access to CCSO facilities *** must fully complete the Known Criminal Organization/Gang Membership Disclosure Form and disclose:

1. Any and all current or past membership; and/or

2. Family Relationships or Associations with any Known Criminal Organizations or Members.

B. Refusal to complete or falsifying information on the Disclosure shall result in:

1. Disciplinary action up to and including termination of CCSO employees.

2. Revocation of access to CCSO facilities. ***

3. Notification to the Chief Financial Officer regarding contracted employees.

4. Notification to the Executive Director of the Cook County Department of Facilities Management regarding CCDFM or CCDFM contracted employees in violation.

C. Employees shall disclose any and all relevant memberships and associations, even where such is not a violation of CCSO policy (e.g., Family Relationship). Failure to disclose a relevant membership or association is a violation of CCSO policy.

D. Responsibility of Department Head/designee:

1. Ensure all Known Criminal Organization/Gang Membership Disclosures are distributed to and completed by all CCSO employees under his/her supervision bi-annually *(to begin January 2013)*." (Emphasis in original.)

¶ 4 The Gang Order includes an accompanying disclosure form. The form asks employees whether they were members of a Known Criminal Organization/Gang, if they had ever been members of a Known Criminal Organization/Gang, and for corresponding details. The form additionally asks, "Has any Family Relationship *(as defined in the policy)* or Associate ever been in a Known Criminal Organization/Gang Member or an Associate of a Known Criminal Organization within the past ten years?" The form again asks for corresponding details. At the bottom of the form is a space for the employee's signature and the date, above which is written, "By signing below, I certify that the above information has been completed to the best of my knowledge."

¶ 5 The second order at issue is the Rules of Conduct Order (No. 11.2.20.0), which has seven sections that are marked with roman numerals. The Rules of Conduct Order states in part in section II that employees "shall conduct themselves in a professional and ethical manner both on and off duty." Section VI of the order, which is the only section directly at issue, states in relevant part:

"*VI. RULES AND REGULATIONS FOR ALL SWORN AND CIVILIAN CCSO EMPLOYEES*

\* \* \*

B. Conduct on and off duty.

CCSO employees shall:

1. Maintain a professional demeanor while on duty and will not engage in off-duty behavior that would reflect negatively on the CCSO.

2. Conduct themselves on and off-duty in such a manner to reflect favorably on the CCSO. Employees, whether on or off-duty, will not engage in conduct which discredits the integrity of the CCSO, its employees, the employee him/herself, or which impairs the operations of the CCSO. Such actions shall constitute conduct unbecoming of an officer or employee of the CCSO.

3. Be aware that conduct on and off duty extends to electronic social media and networking sites and that all rules of conduct apply when engaging in any Internet activity.

4. Maintain a level of conduct in their personal and business affairs that is in keeping with the highest standards of the law enforcement profession. Employees will not participate in any incident that:

a. Involves moral turpitude or impairs their ability to perform as law enforcement officers; or

b. Causes the CCSO to be brought into disrepute.

5. Not use their official position, official identification cards, stars or hat shields for:

a. Personal or financial gain for themselves or others.

b. Obtaining privileges not otherwise available to them except in the performance of duty.

c. Avoiding consequences of illegal acts.

6. Respect and be courteous to others and the public. Employees will be tactful in the performance of their duties, will control their tempers and exercise the utmost patience and discretion and will not engage in argumentative discussions even in the face of extreme provocation.

7. If sworn, carry CCSO credentials (e.g., Sheriff's Photo Identification, County Identification, Firearm Owners Identification Card) on their person at all times except when impractical or dangerous to their safety or to an investigation; and make every effort to ensure the security and safekeeping of all identification, including star and hat shield.

8. Furnish their names and star numbers where applicable to any person requesting that information while on duty, unless withholding such information is necessary for the performance of police duties (e.g., undercover work).

9. Not use threats and coercion, or abusive, coarse, violent, profane, harassing, or insolent language or gestures.

10. Ensure that relationships with colleagues promote mutual respect within the profession and improve quality of service.

11. Utilize CCSO equipment only for its intended purpose and in accordance with the established procedures; shall not abuse or willfully damage CCSO equipment; shall use reasonable care to avoid loss of CCSO equipment; and shall maintain CCSO equipment in accordance with established procedures.

12. Not engage in any conduct that constitutes discrimination or harassment as defined in CCSO directives regarding discrimination, harassment, sexual harassment, and hostile work environment."

¶ 6    The record contains email correspondence between Union representatives and respondents about the orders. On January 25, 2013, the Union's attorney wrote an email to respondents with the subject line, "Sheriff Rules of conduct, 11.2.20.0 and 11.2.21.0." The Union's attorney demanded to bargain "over this proposed General Order" because it might affect wages, hours, and terms and conditions of employment. The Union's attorney asked to advise when "such a meeting may be scheduled" and suggested that the meeting be held with "the pending request(s) for a DOC labor/management meeting." Approximately 30 minutes later, an attorney for respondents replied, "Please see the newly issued Order referenced in your last email. If there is a particular area that you are concerned about that is in conflict with or departs from the predecessor to this Order *** , please let me know." On February 12, 2013, the Union's attorney sent respondents a letter that demanded to bargain over both orders.

¶ 7    On April 4, 2013, the Union filed a charge with the Board that respondents engaged in unfair labor practices related to the orders. The Union initially contended that both orders were unlawful unilateral changes to terms and conditions of employment without notice or the opportunity to bargain, though it later amended its position to maintain that only the Gang

Order was a subject of mandatory bargaining. The Union additionally asserted in its charge that the Rules of Conduct Order contained overbroad restrictions on employee use of social media and networking sites.

¶ 8        On September 18, 2013, a hearing began before an administrative law judge (ALJ). Dennis Andrews, a Union business agent for the Cook County department of corrections, testified about the state of bargaining between the parties. Andrews stated that the Union did not receive a response to its email demand to bargain. Andrews further stated that he was involved in collective bargaining negotiations for the current department of corrections contracts, which began in January 2013. Andrews had attended each of the eight or nine bargaining sessions. According to Andrews, the orders were implemented before the first collective bargaining session, and neither the Sheriff nor the Union had raised either of the orders as a proposal at the bargaining table. Andrews stated that the Union had not raised the orders because it had demanded to bargain and the Sheriff had not responded with a proposal or meeting to discuss the orders. Andrews's position was that if the Union demanded to bargain, it was up to the employer to respond. Andrews acknowledged that he did not have anything in writing from respondents that stated they would not bargain over the orders.

¶ 9        Andrews also testified about his interpretation of the Gang Order. He stated that before the Gang Order, neither he nor other officers had ever been required to complete a disclosure form for gang affiliations. Andrews described the paperwork as cumbersome and stated that the order required employees to investigate their family members and close associates. Andrews further stated that it was a lot of work for employees "to determine if their cousin that they haven't seen in five years that lives in Iowa, or their sister who lives out in California," fell into one of the named categories. According to Andrews, the disclosure requirement imposed a disciplinary burden, in that "if you are not sure, you don't know and you don't disclose it, then the Department comes to find out that maybe your brother-in-law was in a gang or is in a gang that you might not have knowledge of, you could be disciplined for not documenting that and giving them that information." Andrews also stated that the Union found problematic the language that prohibits associating with anyone the employee "knew or should have known" is or was in a gang. Andrews asked, "What if it is your father, or your mother, sister?"

¶ 10       Andrews acknowledged that an October 1998 general order for the Cook County department of corrections contained a provision stating, "No employee will frequent any establishment or knowingly associate with persons having known criminal records that would bring discredit to the department, except when properly authorized to do so." Andrews also acknowledged that the October 1998 general order contained a provision stating, "Employees will not visit any correctional institution for the purpose of visiting a detainee, inmate, or person incarcerated, not in their immediate family, without first submitting written notification to the divisional Superintendent/Unit Head. Immediate family includes: Father, Mother, Siblings and legal children (of the employee)." Andrews was also directed to a March 2001 general order for the court services department that directed employees to "avoid regular or continuous associations or dealings with persons whom they know, or should know, are persons under criminal investigation or indictment, or who have a reputation in the community or the department for present or past involvement in felonious or criminal behavior." Andrews stated that the March 2001 order did not apply to the department of corrections and maintained that the Gang Order was the first time the "should have known" language was applied to department of corrections employees.

¶ 11    Asked to explain the benefits that the Union could bring to bargaining over the Gang Order, Andrews stated that the Union would raise its concerns about the possibility of discipline and the cumbersome paperwork and would ask respondents to "expound more upon what they really want in this and why they want it." Andrews added that he would explain that the burden was on officers to investigate family members. Andrews further stated that the order was vague and did not inform employees of the ultimate goal.

¶ 12    Andrews also testified about the Union's opposition to the social media provision in the Rules of Conduct Order. Andrews stated that there had not been any previous written work rules governing conduct on social media platforms. According to Andrews, the Union's concern was that "you are constantly getting friended" on social media without knowing "how [a person] [conducts] themselves," and an employee could be disciplined if that person was determined to be a known criminal, gang member, or former or released felon. Andrews further stated that the correctional officers have their own Facebook page "[s]o they can vent to each other" and "pass out information." Andrews had seen complaints on the page about staffing levels. Andrews did not know of any employees who had been disciplined for statements made on the Facebook page. However, the administration monitored the page, and the Union was concerned that an employee could be disciplined "if somebody says the wrong thing on there or has a bad day at work *** and gets on the computer to vent." Andrews further stated that the Rules of Conduct Order did not indicate exactly what employees could and could not do on social media.

¶ 13    John Figueroa, who was assigned to the Union as the chief steward for the court services division, testified that the Union had demanded to bargain over the orders almost immediately after they were implemented, "if not the same day or the day after." Meanwhile, collective bargaining negotiations for the court services department were ongoing. Figueroa also stated that in his 25-year career with the Sheriff's office, he had not been previously required to complete a disclosure form related to gang or criminal organization affiliations. Additionally, Figueroa testified that members of the court services department engaged in criticism of workplace conditions on Facebook, such as complaining about inadequate elevators or criticizing staffing levels.

¶ 14    Kim Vargas, a department of corrections employee, testified that she was first required to complete a gang affiliation disclosure form in January 2013. Vargas further stated that she had been subjected to an office of professional review interrogation related to the disclosure form. Vargas stated that she was "called in for the Sheriff's Order that we were all supposed to fill out" and was notified that she did not properly complete it. Vargas completed an additional form and then was told to report for an accused investigation. Vargas believed that she could be suspended or lose her job, but had not yet been disciplined.

¶ 15    Respondents presented the testimony of Heather Bock, who worked in the Sheriff's office of policy and accountability and drafted the Gang Order. Bock stated that the Gang Order itself was new, but was not a new policy, as the provisions—apart from the signature on the form—could be found in previous orders. These older provisions stated that "[n]o employee will frequent any establishment or knowingly associate with persons having known criminal records that would bring discredit to the department, except when properly authorized to do so," and "[e]xcept in the performance of official duties, or where unavoidable because of other family relationships, members will avoid regular or continuous associations or dealings with persons whom they know, or should know, are persons under criminal investigation or

indictment, or who have a reputation in the community or the department for present or past involvement in felonious or criminal behavior." However, Bock agreed that the Gang Order's disclosure form was a new requirement.

¶ 16    As for the Rules of Conduct Order, Bock agreed that the statement, "Be aware that conduct on and off-duty extends to electronic social media" was new, but maintained that the basic rule was not really new. Bock asserted that the social media provision was a specific situation of on and off-duty conduct. Bock also stated that the orders did not change the kind of work that employees perform on a daily basis and consisted of "[j]ust filling out a form," which employees do every day.

¶ 17    Peter Kramer, an attorney in the Sheriff's office that handled labor matters, testified that the Sheriff had not refused to bargain over the two orders. Kramer asserted that "[e]verything is on the table" and that the Sheriff would be willing to bargain over the orders. Kramer was asked to recall instances where officers received corrective action because of gang or criminal affiliation. Kramer stated, "That happens all the time. Most frequently it involves officers bringing contraband into the facility, but there have been sporadic incidents." Kramer noted an incident the previous month where a lieutenant traded inappropriate letters with a detainee and recalled that earlier in the year, an officer with a gang affiliation was shot. Kramer further stated that two or three months earlier, an officer was alleged to have "some gang affiliations, got in a bunch of trouble over like three different things."

¶ 18    After the hearing, the parties submitted posthearing briefs. In its brief, the Union clarified that its challenges to the Gang Order were the heightened opportunities for discipline from the disclosure form and the requirement that employees disclose all family and associates who may have been involved in criminal organizations, regardless of whether employees were aware of that involvement when they completed the form. The Union contended that the increased possibility for discipline made the new disclosure requirement a mandatory subject of bargaining. The Union further stated that respondents did not articulate any burdens to bargaining. Additionally, the Union asserted that respondents instituted the Gang Order without providing advance notice and an opportunity to bargain, despite the Union's repeated and timely requests to do so. The Union further contended that the social media provision was overly broad, vague, and violated employees' rights under section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2012)).

¶ 19    In their brief, respondents asserted that the Sheriff is statutorily tasked with providing safety and security to employees and detainees and that gang affiliation with people detained in custody poses serious safety concerns. Respondents further stated that the issues of public safety, crime prevention, and correctional and courthouse security were within the inherent management authority and not subject to bargaining. Respondents contended that even if the orders affected wages, hours, and terms and conditions of employment, the public policies of preventing crime, citizen safety, and the security of jails and courthouses outweighed the Union's interest in bargaining. Respondents also asserted that there had been problems with officers brought up on charges because of contact with felons or gang members, as well as incidents of officers bringing contraband into the jail. Respondents further stated that the Union's complaint should be dismissed because bargaining was ongoing. Additionally, respondents contended that the social media provision did not impose new requirements on employees' off-duty conduct.

¶ 20    The ALJ issued her decision on March 6, 2015, and agreed with the Union as to both orders. Applying the test for whether a matter is subject to mandatory bargaining that was outlined in *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496 (1992), the ALJ found that the Gang Order was a term and condition of employment because it subjected employees to potential discipline and employees could be barred from the premises for violating the order. The ALJ also found that the Gang Order involved a matter of inherent managerial policy, stating that that the Sheriff had a statutory duty to maintain safety and security within the county and the facilities under its control. After balancing the competing interests, the ALJ asserted that the benefits of bargaining over the Gang Order outweighed the burdens on respondents' inherent managerial authority. The ALJ stated that the examples of problems given by respondents at the hearing were extremely vague and that respondents had not sufficiently demonstrated how bargaining over the Gang Order would significantly impact their ability to carry out their statutory duties. The ALJ stated that, in contrast, employees had a strong interest in bargaining over the Gang Order, noting that employees could be disciplined and barred from the premises under the order. The ALJ additionally found that respondents unilaterally imposed the Gang Order without bargaining to impasse. The ALJ stated that, at a minimum, respondents were required to give the Union adequate notice and a meaningful opportunity to bargain before implementing the policy, which they did not do.

¶ 21    Turning to the Rules of Conduct order, the ALJ found that the social media provision was unlawfully overbroad in violation of section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2012)). The ALJ asserted that the Board had not addressed whether a work rule that does not explicitly restrict protected activity could be unlawful, but the National Labor Relations Board (NLRB) had frequently addressed that issue. The ALJ further stated that the social media provision on its own did not prohibit any conduct and was instead a clarification that the conduct described in the conduct unbecoming provision applied to social media. As a result, according to the ALJ, the social media provision was overly broad if the conduct unbecoming provision was overly broad. Relying on NLRB decisions, the ALJ found that the conduct unbecoming provision was unlawful because it was not limited to unprotected activity and did not contain limiting language or any description of what was meant by conduct that would discredit respondents' integrity. The ALJ stated that a reasonable employee could believe that the rule prohibits publicly criticizing the employer and its employment practices. The ALJ further stated that because the conduct unbecoming provision was overly broad, any application of the social media provision to the conduct unbecoming provision was also overly broad.

¶ 22    Subsequently, respondents filed exceptions in opposition to the ALJ's recommended decision and order. In part, respondents contended that the issues of public safety, crime prevention, and correctional and court facility security were within their inherent authority and not subject to bargaining. Respondents cited several statutes that described their obligations and asserted that the legislature's intent was to impose serious penalties to prevent interference with penal institutions such as the Cook County department of corrections. Respondents also contended that the Union did not present any rebuttal evidence that having officers with gang and criminal affiliation was not a serious problem. Additionally, respondents stated that the Rules of Conduct Order language at issue had been used by the Sheriff and numerous Illinois municipal agencies for decades and had become well-defined practice. Respondents further

asserted that there was no evidence that the language had ever been used as the basis to discourage or discipline employees from engaging in protected activity. Lastly, respondents contended that the Sheriff had not refused to bargain and the Union had not raised the orders at the bargaining table.

¶ 23      On September 28, 2015, the Board issued a written decision that reversed the ALJ's recommended decision and order. The Board found that respondents did not violate the Act "when they unilaterally implemented the Gang Order" because the Gang Order was not a mandatory subject of bargaining. The Board asserted that there was a self-evident connection between "dealing with the widespread gang problem, in order to address [respondents'] mandate to provide safety and keep the peace" and "having current and accurate information about and/or proscribing the gang membership and related associations with persons having gang affiliations." The Board also referred to section 5 of the Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147/5 (West 2012)), which stated that areas throughout Illinois were being "terrorized and plundered by streetgangs" and that streetgangs' activities "present a clear and present danger to public order and safety and are not constitutionally protected." The Board added that it was aware of the "well-publicized and staggering number of violent crimes" in and around Chicago, as well as "the ongoing and inextricable connection between violent crime and gang activity." The Board further stated that it recognized that the threat of gang violence, gang activity, and gang influence was magnified in an environment such as the Cook County jail and other places where respondents are mandated to provide safety and keep the peace. The Board found that the Gang Order was "clearly a matter of inherent managerial authority" and the balance weighed significantly in favor of respondents' managerial rights.

¶ 24      Turning to the Rules of Conduct Order, the Board found that the conduct unbecoming rule had existed in predecessor general orders since at least 1998 and that its substantive essence had not been changed simply because respondents advised employees that the same proscription applied to conduct carried out by contemporary means of communication. The Board asserted that the ALJ's analysis "overlooks the critical fact that the conduct proscribed, has been proscribed, in essentially the same 'conduct unbecoming' terms since at least 1998." The Board could not find any evidence in the record to suggest that the Union had previously challenged the conduct unbecoming rule and stated that the Union could not point to any instance in the long life of the conduct unbecoming rule when the employer had punished an employee for exercising protected rights. The Board stated that under these circumstances, a reasonable employee would not be justified in the belief that the rule morphed into a prohibition on publicly criticizing the employer and its employment practices or that the rule otherwise tended to interfere with or coerce employees in the exercise of the right to engage in protected activity.

¶ 25      One Board member dissented as to the Gang Order, disagreeing with the Board's finding that the burden of bargaining outweighed its benefits. The dissenting Board member recognized respondents' need to limit employees' association with gang members, but found that the evidence was insufficient to establish that requiring respondents to bargain over the Gang Order would impair their ability to carry out their statutory mission. According to the dissenting Board member, respondents introduced little evidence to show that employees' associations with gangs had suddenly become urgent to the point that bargaining would be a significant burden on respondents' inherent managerial rights. The dissenting Board member

stated that the Gang Order imposed significant new responsibilities and that bargaining might have increased the chances that those responsibilities would have been more clearly defined and reasonable.

¶ 26     The Union subsequently appealed.

¶ 27                                    II. ANALYSIS
¶ 28                                    A. Gang Order
¶ 29     On appeal, the Union first contends that respondents violated sections 10(a)(1) and 10(a)(4) of the Act (5 ILCS 315/10(a)(1), (a)(4) (West 2012)) by failing and refusing to bargain over the Gang Order. The Union argues that the "should have known" language and disclosure requirement constitute changes to the terms and conditions of employment. The Union further asserts that the Gang Order involves heightened opportunities for discipline. The Union also maintains that the Gang Order does not involve inherent managerial authority, but that if it does, the benefits of bargaining outweigh the burdens. The Union contends that through bargaining, the Union could help formulate and clarify the Gang Order, as well as assist respondents in meeting their objectives. The Union also states that respondents did not articulate any burdens to bargaining.

¶ 30     "The issue of whether a public employer is required to bargain over a specific subject generally involves a mixed question of law and fact," which warrants a clearly erroneous standard of review. *Forest Preserve District v. Illinois Labor Relations Board*, 369 Ill. App. 3d 733, 751 (2006). We will reverse the Board's decision only where, on the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.* at 752. This standard provides some deference to an administrative agency's experience and expertise. *County of Cook v. Illinois Labor Relations Board, Local Panel*, 347 Ill. App. 3d 538, 551 (2004). Meanwhile, the Board's findings and conclusions on questions of fact are considered to be *prima facie* true and correct. *Chicago Transit Authority v. Amalgamated Transit Union*, 299 Ill. App. 3d 934, 940-41 (1998). We defer to the Board's factual conclusions and reverse them only if they are against the manifest weight of the evidence. *Id.* at 941. Additionally, we review questions of law *de novo*. *Id.*

¶ 31     Turning to the applicable statutes, sections 10(a)(1) and 10(a)(4) of the Act state in part:
        "(a) It shall be an unfair labor practice for an employer or its agents:
            (1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization or contribute financial or other support to it *** [or]
                                    * * *
            (4) to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit, including, but not limited to, the discussing of grievances with the exclusive representative[.]" 5 ILCS 315/10(a)(1), (a)(4) (West 2012).

¶ 32     Section 7 of the Act states that a public employer and the exclusive representative of the public employees have the duty to bargain collectively "over any matter with respect to wages, hours and other conditions of employment." 5 ILCS 315/7 (West 2012). However, employers are not required to bargain over matters of "inherent managerial policy," which include "such

- 11 -

areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4 (West 2012). It is possible for a matter to be both one of wages, hours, and other conditions of employment and within an employer's inherent managerial authority. *Central City*, 149 Ill. 2d at 523. Faced with these scenarios, *Central City* set out a test to determine whether a matter is a subject of mandatory bargaining. *Id.* See also *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 206 (1998) (applying the *Central City* test to cases arising under the Act). Under the *Central City* test, a matter is a mandatory subject of bargaining if it (1) involves wages, hours, and terms and conditions of employment and (2) is either not a matter of inherent managerial authority or (3) is a matter of inherent managerial authority but the benefits of bargaining outweigh the burdens bargaining imposes on the employer's authority. *Central City*, 149 Ill. 2d at 523; *Forest Preserve District*, 369 Ill. App. 3d at 752.

¶ 33    A matter concerns wages, hours, and terms and conditions of employment if it (1) involved a departure from previously established operating practices, (2) effected a change in the conditions of employment, or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the Union. *Chicago Park District v. Illinois Labor Relations Board*, 354 Ill. App. 3d 595, 602 (2004). Further, a rule that subjects employees to potential discipline concerns the terms and conditions of employment. See *County of Cook*, 347 Ill. App. 3d at 552 (because residency requirement subjected employees to potential discipline, requirement affected employees' terms and conditions of employment).

¶ 34    The Gang Order has two components at issue—the "should have known" requirement and the disclosure requirement. We consider whether each component concerns the terms and conditions of employment. The Sheriff maintains that the "should have known" language is not new, and points to a previous court services order that stated that employees were to "avoid regular or continuous associations or dealings with persons whom they know, or should know, are persons under criminal investigation or indictment, or who have a reputation in the community or the department for present or past involvement in felonious or criminal behavior." The Sheriff also refers to a previous general order that stated, "No employee will *** knowingly associate with persons having known criminal records that would bring discredit to the department, except when properly authorized to do so."

¶ 35    The Sheriff overlooks key differences between previous orders and the Gang Order. The Gang Order states that an employee may not associate with anyone who the employee "knew or should have known *** is or was a member of a Known Criminal Organization." Even if the "should have known" language was in a previous order, the Gang Order redefined the category of people with whom an employee may not associate. While the previous orders prohibited associating with people who had criminal records, were under criminal investigation or indictment, or had a particular reputation, the Gang Order prohibits associating with people who are members of a group with certain traits—namely, the group forms an allegiance for a common purpose, engages in criminal activity, and does one or more of the following: shares a common group name, shares common symbols, tattoos, or graffiti, shares a common style of dress, frequently congregates upon, or lays claim to, a geographic location, and associates together on a regular or continuous basis. Moreover, the Gang Order has a broader sweep. Now, to be someone with whom the employee may not associate, a person need not have

personally engaged in criminal activity or have a reputation for doing so, but need only to have been part of a group that does. Further, the Gang Order states that "[a]ny violation of this order may result in denial of access to the CCSO; disciplinary action up to and including termination; and/or criminal charges where applicable." Because employees are subject to potential discipline for associating with a new category of people, the "should have known" requirement concerns the terms and conditions of employment.

¶ 36    The disclosure requirement also amounts to a change that affects the terms and conditions of employment. Under the Gang Order, employees must disclose "any and all memberships and associations" and states that "[f]ailure to disclose a relevant membership or association is a violation of CCSO policy." Refusal to complete information or falsifying information on the disclosure form results in "[d]isciplinary action up to and including termination." The Sheriff refers to the testimony of Heather Bock, who stated that the orders did not change the kind of work that employees perform on a daily basis and consisted of "[j]ust filling out a form," which employees do every day. At the same time, Bock stated that the disclosure form was a new requirement, and Union witnesses testified that they had never had to disclose gang affiliations before. As with the "should have known" rule, the disclosure form requirement is a change that subjects employees to potential discipline, and therefore involves a change to the terms and conditions of employment. See *id.*

¶ 37    The next question is whether the Gang Order is also a matter of inherent managerial authority, which has been defined as those matters residing "at the core of entrepreneurial control." (Internal quotation marks omitted.) *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97 (2007) (quoting *Ford Motor Co. v. National Labor Relations Board*, 441 U.S. 488, 498 (1979)). As noted above, section 4 of the Act states that matters of inherent managerial policy include "such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4 (West 2012). It was not clearly erroneous to conclude that the Gang Order is a matter of the employer's inherent managerial authority. The legislature has designated each sheriff as "conservator of the peace" in his county, who "shall prevent crime and maintain the safety and order of the citizens of that county." 55 ILCS 5/3-6021 (West 2012). The Gang Order relates to preventing crime and maintaining safety—a function of the employer—and so is a matter at the core of respondents' entrepreneurial control.

¶ 38    Moving to the next part of the *Central City* test, we must balance the benefits of bargaining against the burdens of bargaining on respondents. Relevant to this analysis, respondents presented testimony at the hearing about the extent of the gang problems among employees. Peter Kramer, a Sheriff's office attorney, stated that officers receive corrective action because of gang or criminal affiliation "all the time," but also stated that "there have been sporadic incidents." Kramer recalled three incidents in the past year where employees' gang affiliations had caused problems. For the Union's part, Dennis Andrews testified that if the Gang Order were bargained, the Union would raise concerns about the paperwork and the possibility of discipline and would ask respondents to "expound more upon what they really want in this and why they want it." Andrews expressed concern that employees could be disciplined for not disclosing gang affiliations of family members of which employees were not aware. Andrews was also concerned that employees would have to investigate their family members and close associates, and noted that it would be a lot of work for an employee to determine if his "cousin

that [he] hasn't seen in five years that lives in Iowa" or "[his] sister who lives out in California," falls into one of the relevant categories.

¶ 39    Though we do not doubt Kramer's testimony that gang affiliation among employees is a problem, the record does not indicate that this problem was so urgent that bargaining was not a possibility. Kramer noted three incidents in the past year and characterized the problems as "sporadic." Further, the statute the Board relied on to reach its conclusion—the Illinois Streetgang Terrorism Omnibus Prevention Act (740 ILCS 147/5 (West 2012))—was made effective in 1993 and has not been amended since then. The evidence suggests that gang affiliations among employees have been an ongoing problem, but not that the problem had increased to the point where there was no time to bargain. Moreover, the parties were about to begin collective bargaining negotiations anyway when the new order was issued. But *cf. American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 263, 268 (1989) (in finding the burdens outweighed the benefits of bargaining a new drug testing policy, the court noted that the employer continued to find drugs in prison and drug use despite numerous measures, that as of spring 1988, officials were investigating 217 employees for possible drug dealing at the prison facilities, and that a survey revealed that 18% of trainees were involved with illegal drugs). See also *Forest Preserve District*, 369 Ill. App. 3d at 753-54 (matter was subject of mandatory bargaining where the ALJ determined that the employer had time to bargain and that the employer's asserted problems "were not so immediate that bargaining could not have occurred"). Further, and contrary to the Board's assertion at oral argument, the Union indeed presented the benefits of bargaining, as well as highlighted areas of concern that bargaining could address. Andrews's testimony indicates that bargaining could clarify the requirements of the disclosure form and what employees are actually tasked with, which would tailor the Gang Order to better meet respondents' needs. Additionally, Union members have a significant interest avoiding the prohibited associations and completing the disclosure form correctly, as they could lose their jobs otherwise. See *Town of Cicero v. Illinois Ass'n of Firefighters, IAFF Local 717*, 338 Ill. App. 3d 364, 371 (2003) (union members' significant interest in the matter at stake was a consideration in the balancing analysis). We acknowledge that which matters are subject to mandatory bargaining and which are not are very fact-specific questions that the Board, given its experience, is eminently qualified to decide. *Chicago Park District*, 354 Ill. App. 3d at 602. At the same time, the clearly erroneous standard of review does not "relegate judicial review to mere blind deference of an agency's order." *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 98. Under these circumstances, the Board's conclusion was clearly erroneous, and the benefits of bargaining the Gang Order outweigh the burdens.

¶ 40    Having determined that the Gang Order was a subject of mandatory bargaining, we next consider whether respondents refused to bargain. The Union contends that it timely demanded to bargain the Gang Order, but no opportunity to bargain occurred. Meanwhile, the Sheriff asserts that he has not refused to bargain and that the Union has not raised the orders at the bargaining table. The Sheriff notes that the record does not contain evidence that the Sheriff ever stated in writing that he would not bargain. In its written decision, the Board appeared to agree that respondents unilaterally implemented the orders, having stated that respondents did not violate the Act "when they unilaterally implemented the Gang Order."

¶ 41    When an employer has the duty to bargain, it must provide notice of its willingness to bargain before the time its plans are fixed. *Service Employees International Local Union No.*

*316 v. Illinois Educational Labor Relations Board*, 153 Ill. App. 3d 744, 755 (1987). For its part, "[o]nce a union has been notified of a topic of bargaining, it must pursue bargaining." *Id.*

¶ 42    The Board's implied finding that respondents refused to bargain was not against the manifest weight of the evidence. The record indicates that the Union fulfilled its obligation to pursue bargaining, but respondents failed to notify the Union they were willing to bargain before implementing the Gang Order. The Gang Order states that it was issued on January 18, 2013, and was effective on January 25, 2013. On January 25, 2013, the Union's attorney sent an email that demanded to bargain and requested that the Gang Order and Rules of Conduct Order be held in abeyance. In their reply, respondents did not indicate that they were willing to bargain before implementing the Gang Order. The email response to the Union advised the Union's attorney to "see the newly issued Order" and to let respondents' attorney know if there was a particular area of concern. As an aside, the record does not disclose whether the Union was notified about the orders before January 25, but respondents do not contend that the Union's demand to bargain was untimely. John Figueroa, one of the Union's witnesses, testified that the Union demanded to bargain over the orders almost immediately after they were implemented, "if not the same day or the day after." Returning to the matter at hand, despite the Union's demand to bargain, respondents implemented the Gang Order. Kim Vargas, a department of corrections employee, testified that she had to complete a disclosure form in January 2013. Simply being willing to hear particular areas of concern was insufficient—respondents should have communicated a willingness to bargain in response to the Union's demand. The Gang Order was presented as an impermissible *fait accompli*. See *Chicago Transit Authority*, 299 Ill. App. 3d at 944 (where correspondence from employer simply announced a job reclassification and changes in wage rates and stated that the employer would address questions, employer presented matter as a *fait accompli* and failed to bargain in good faith).

¶ 43    Because respondents refused to bargain the Gang Order—a subject of mandatory bargaining—in spite of the Union's demand, they violated the Act.

¶ 44                                    B. Social Media Policy

¶ 45    Next, we consider the Union's contention that the social media policy is overbroad and violates section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2012)). The Union urges this court to adopt the ALJ's reasoning and relies on advice memoranda from the general counsel of the NLRB.

¶ 46    As the Union recognizes, Illinois courts have not yet addressed the issue of whether a social media policy—or any work rule, for that matter—violates section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2012)) because it is overbroad on its face. However, in labor cases, the rulings of the NLRB and federal courts that construe the National Labor Relations Act are persuasive authority for similar provisions in the Illinois Act. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 579 (2005). Further, our supreme court has recognized the close parallel between section 10(a) of the Act and section 8(a) of the National Labor Relations Act. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989).

¶ 47    Section 10(a)(1) of the Act states in part:

        "(a) It shall be an unfair labor practice for an employer or its agents:

(1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization or contribute financial or other support to it; provided, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay[.]" 5 ILCS 315/10(a)(1) (West 2012).

Additionally, section 6(a) of the Act states in part that employees are protected "in the exercise of the right of self-organization, and may form, join or assist any labor organization," and have the right to "engage in other concerted activities not otherwise prohibited by law for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint or coercion." 5 ILCS 315/6(a) (West 2012).

¶ 48        On the federal side, section 8(a) of the National Labor Relations Act states in part:

"(a) Unfair labor practices by employer

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the [NLRB] pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." 29 U.S.C. § 158(a) (2012).

Moreover, section 7 of the National Labor Relations Act states in part that employees have the right to "self-organization, to form, join, or assist labor organizations" and to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2012).

¶ 49        As for our standard of review, whether the social media policy violates section 10(a)(1) of the Act is a mixed question of law and fact—a question that examines the legal effect of a given set of facts (see *Oleszczuk v. Department of Employment Security*, 336 Ill. App. 3d 46, 50 (2002)). As a result, we review the Board's decision under the clearly erroneous standard, meaning that we will reverse the Board only when a review of the record leaves us with a " ' "definite and firm conviction that a mistake has been committed." ' [Citation.]" *Id.* Federal courts also use a deferential standard of review for NLRB decisions. See *Guardsmark, LLC v. National Labor Relations Board*, 475 F.3d 369, 374 (D.C. Cir. 2007) (stating that NLRB determinations are entitled to considerable deference as long as they are reasonably defensible and that the court defers to the NLRB's interpretation of section 8(a) when the NLRB faithfully applies the applicable standard and adequately explains the basis for its conclusion); *Community Hospitals v. National Labor Relations Board*, 335 F.3d 1079, 1082-83 (D.C. Cir. 2003) (stating that the court will affirm the NLRB's order unless the NLRB acted arbitrarily or otherwise erred in applying established law to the facts of the case).

¶ 50        We are faced with a challenge to a rule's existence, rather than a challenge to an employer's enforcement of a rule. The NLRB has stated that to determine whether the mere maintenance of a rule violates section 8(a)(1) of the National Labor Relations Act, "the appropriate inquiry is whether the [rule] would reasonably tend to chill employees in the

exercise of their Section 7 rights. Where the [rule is] likely to have a chilling effect on Section 7 rights, the [NLRB] may conclude that [its] maintenance is an unfair labor practice, even absent evidence of enforcement." *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998).

¶ 51    Subsequently, the NLRB expanded on the test for determining whether a rule is unlawful in *Martin Luther Memorial Home, Inc.*, 343 N.L.R.B. 646 (2004) (*Lutheran Heritage)*. There, the NLRB distinguished between a rule that explicitly restricts protected activity and one that does not. A rule that explicitly restricts activity protected by section 7 of the National Labor Relations Act is unlawful. *Id*. at 646. If the rule does not explicitly restrict protected activity, the rule is unlawful under any of the following conditions: (1) employees would reasonably construe the language to prohibit protected activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of protected rights. *Id*. at 647. As additional considerations, the NLRB stated that it must give a challenged rule "a reasonable reading," "must refrain from reading particular phrases in isolation, and *** must not presume improper interference with employee rights." *Id*. at 646. Under the *Lutheran Heritage* framework, the validity of a workplace rule does not depend on "subjective employee understandings or actual enforcement patterns, but on an objective inquiry into how a reasonable employee would understand the rule's disputed language." *Quicken Loans, Inc. v. National Labor Relations Board*, 830 F.3d 542, 549 (D.C. Cir. 2016).

¶ 52    In its brief, the Board urges this court not to follow the framework set out in *Lutheran Heritage*. The Board also states that it did not address *Lutheran Heritage* in its decision and argues that *Lutheran Heritage* has been criticized, citing dissents from NLRB decisions.

¶ 53    As stated above, our own research has not revealed any Illinois cases that addressed whether the mere maintenance of a rule violated section 10(a)(1) of the Act. It is possible that Illinois courts have not been presented with a situation where *Lutheran Heritage* applies. In the federal setting, however, *Lutheran Heritage* has been followed in numerous decisions. See, *e.g.*, *Boch Imports, Inc. v. National Labor Relations Board*, 826 F.3d 558, 579 (1st Cir. 2016); *Flex Frac Logistics, LLC v. National Labor Relations Board*, 746 F.3d 205, 208-09 (5th Cir. 2014); *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. National Labor Relations Board*, 520 F.3d 192, 197 (2d Cir. 2008); *Guardsmark, LLC*, 475 F.3d at 374; *Schwans Home Service, Inc.*, 364 N.L.R.B. No. 20, at *1 (2016); *Valley Health System LLC*, 363 N.L.R.B. No. 178, at *1 (2016); *T-Mobile USA, Inc.*, 363 N.L.R.B. No. 171 at *1 (2016); *Hills & Dales General Hospital*, 360 N.L.R.B. No. 70 (2014); *Karl Knauz Motors, Inc.*, 358 N.L.R.B. 1754, 1754 (2012); *Costco Wholesale Corp.*, 358 N.L.R.B. 1100, 1101 (2012); *Albertson's, Inc.*, 351 N.L.R.B. 254, 259 (2007). *Lutheran Heritage* has also been cited as additional authority in an Illinois Board decision, though it was in the context of a challenge to the enforcement of a work rule. *Illinois Troopers Lodge No. 41*, 30 PERI ¶ 70 (ILRB State Panel 2013). Given *Lutheran Heritage*'s consistent application in federal cases and NLRB decisions, *Lutheran Heritage* applies here.

¶ 54    Furthermore, for all of the Board's criticism of *Lutheran Heritage* in its brief, it has not provided an alternative framework for assessing where the mere maintenance of a rule is unlawful, without evidence of enforcement. The Board only points to dissents from NLRB decisions as instances where *Lutheran Heritage* has been criticized. The Board further asserts that the standard for section 10(a)(1) violations is whether the employer's conduct, viewed objectively from an employee's standpoint, reasonably tended to interfere with, restrain, or coerce employees in the exercise of activity protected under the Act. Yet, the Board's support

for that standard consists of cases where a union challenges an affirmative act by an employer, rather than the situation we are faced with here, where the Union asserts that merely maintaining the rule is unlawful. See *Amalgamated Transit Union, Local 241*, 30 PERI ¶ 9 (ILRB Local Panel 2013); *County of Woodford*, 14 PERI ¶ 2017 (ISLRB 1998).

¶ 55   We next apply the *Lutheran Heritage* standard to the social media policy at issue. The Union argues that when read with the conduct unbecoming rule, the social media policy has an overbroad chilling effect on employee workplace-based speech on the Internet that violates section 10(a)(1) of the Act.

¶ 56   The conduct unbecoming rule states that employees shall:

> "2. Conduct themselves on and off-duty in such a manner to reflect favorably on the CCSO. Employees, whether on or off-duty, will not engage in conduct which discredits the integrity of the CCSO, its employees, the employee him/herself, or which impairs the operations of the CCSO. Such actions shall constitute conduct unbecoming of an officer or employee of the CCSO."

Immediately following is the social media policy, which states:

> "3. Be aware that conduct on and off duty extends to electronic social media and networking sites and that all rules of conduct apply when engaging in any Internet activity."

¶ 57   The Union states that reading these provisions together, the social media policy prohibits conduct on electronic social media and networking sites that discredits the integrity of the CCSO, its employees, the employee him/herself, or which impairs the operations of the CCSO. Acknowledging that the social media policy does not explicitly prohibit protected activity, the Union asserts that the social media policy is unlawful under the first condition in *Lutheran Heritage*: employees would reasonably construe it to prohibit protected activity. *Lutheran Heritage*, 343 N.L.R.B. at 647. The Union contends that policy does not include limiting language or examples of what behaviors are prohibited. Of note, the Union does not maintain that the social media policy is unlawful under the other two possibilities stated in *Lutheran Heritage*—that the social media policy was promulgated in response to union activity or has been applied to restrict the exercise of protected rights. See *id.*

¶ 58   We find that the mere maintenance of the social media policy does not violate the Act. The Union may be correct that employees could interpret the social media policy to prohibit protected activity, but the possibility that employees could interpret the policy that way is not enough. Where the rule does not refer to protected activity, "we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule *could* be interpreted that way." (Emphasis in original.) *Id.* We reiterate that we must give the social media policy a reasonable reading and not read particular phrases in isolation. *Albertson's, Inc.*, 351 N.L.R.B. at 259. The social media policy is part of a set of three introductory rules of conduct that are followed by nine more specific rules. In context, the social media policy provides that all of the other, more specific rules of conduct—none of which are challenged here—apply to the Internet. The Union has not shown that applying the rules of conduct to Internet activity means that employees would construe the rules of conduct as prohibiting protected activity.

¶ 59   Further, the Union's argument strongly relies on advice memoranda from the general counsel of the NLRB, which are not persuasive authority. The general counsel has final

- 18 -

authority regarding investigations into unfair labor practices and prosecution of complaints before the NLRB. 29 U.S.C. § 153(d) (2012). In contrast, it is the NLRB that applies "the [National Labor Relations Act's] general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms." *Republic Aviation Corp. v. National Labor Relations Board*, 324 U.S. 793, 798 (1945). While NLRB decisions are persuasive, the advice memoranda are not. Further, the Union did not present NLRB decisions or federal cases that suggest the social media policy is unlawful. The mere maintenance of the social media policy in the Rules of Conduct Order does not violate the Act.

¶ 60                                    III. CONCLUSION

¶ 61        For the reasons stated above, respondents violated the Act by refusing to bargain the Gang Order. However, the social media policy is not overbroad and does not violate the Act. We reverse the Board's decision as to the Gang Order and affirm the Board's decision as to the social media policy in the Rules of Conduct Order.

¶ 62        Reversed in part; affirmed in part.