AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EM-
PLOYEES, Petitioner-Appellant, v. ILLINOIS STATE LABOR RELATIONS
BOARD *et al.*, Respondents-Appellees.

First District (5th Division)    No. 1—94—0253

Opinion filed August 4, 1995.

Mark S. Stein and Richard J. Tupper, both of Cornfield & Feldman, of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Brain F. Barov, Assistant Attorney General, of counsel), for respondents.

JUSTICE T. O'BRIEN delivered the opinion of the court:

Petitioner, American Federation of State, County and Municipal Employees (AFSCME), appeals from a decision and order of the Illinois State Labor Relations Board (Board). The Board ruled that respondent, Illinois Department of Central Management Services (CMS), did not violate section 10(a)(4) of the Illinois Public Labor Relations Act (Act) when it failed to engage in collective bargaining with AFSCME. (5 ILCS 315/10(a)(4) (West 1992).) We affirm.

At issue in this case is whether the CMS, *vis-a-vis* the Illinois Department of Public Aid (IDPA), committed an unfair labor practice in refusing to meet with AFSCME in connection with a reduction in force (RIF) at IDPA. The RIF, which occurred as a result of a decrease in State funding for fiscal year 1993, affected certain public employees represented by AFSCME.

On February 24, 1992, Max Liberles, president of AFSCME Local 2000, sent a letter on behalf of the union to Philip Bradley, Director of IDPA, requesting a briefing on the Department's fiscal 1993 budget. The letter stated in pertinent part:

"I am writing you regarding two major issues facing our union and to request a meeting with you as soon as possible.

First, we would like a budget briefing on the Department's FY'93 budget. We want to know about staffing plans as they affect the

approximately 7,500 employees we represent as well as programmatic changes.

Based upon the rumors circulating, we may have some serious differences, which would put us in an adverse and confrontational position internally as well as externally for the first time in years."

Bradley responded that a meeting on the Department's budget would be premature at that time in light of the fact that IDPA had not yet fully determined how the budget would affect its operations. He noted that several options were still under consideration in order to "provide the highest levels of services and benefits possible while remaining cognizant of the fact that the State faces a tough budget." Bradley did indicate, however, that the proposed budget could impact employees represented by AFSCME.

In a subsequent correspondence, IDPA informed AFSCME that a briefing on the Department's budget would be held in Springfield, Illinois, on April 6, 1992, one day prior to the submission of the State's budget to the Illinois General Assembly.[1] AFSCME originally agreed to the meeting, but was later informed that the meeting had to be postponed until April 7, 1992. Due to a conflict in schedules, AFSCME personnel could not attend the April 7, 1992, meeting. Liberles, therefore, advised IDPA that AFSCME would review the Department's budget after the State's budget was submitted to the General Assembly.

On April 7, 1992, the governor submitted the State's budget as expected. On that same day, Bradley sent a letter to all IDPA employees announcing potential layoffs. Bradley explained that the layoffs were necessary because of a 0.6% decrease in the Department's budget from the prior year. In particular, Bradley disclosed the possible elimination of 759 bargaining unit and nonbargaining unit positions as well as the layoff of 80 individuals. Many of the layoffs were to occur in IDPA's welfare-to-work and transitional assistance programs.

The parties then scheduled another meeting on the Department's budget for April 17, 1992. On the day before the meeting, however, Liberles telephoned James Berger, IDPA's administrator of personnel management and labor relations, and told him that AFSCME intended to file an unfair labor charge with the Illinois State Labor Relations Board. Berger voiced his disapproval of the filing, but added as he ended the conversation that he hoped such an action could be

---

[1]The State's proposed fiscal year 1993 budget included the proposed budget for IDPA as well.

avoided. Berger immediately called Liberles back and inquired as to the nature of AFSCME's charge. Liberles informed him the charge related to IDPA's failure to discuss the proposed layoffs. When Berger asked Liberles to be more specific, Liberles refused. Berger then cancelled the parties' scheduled meeting.

AFSCME proceeded to file its first unfair labor charge (S—CA—92—153) on April 17, 1992. Ten days later, AFSCME filed a second charge (S—CA—92—161) on the basis that IDPA committed an unfair labor practice when Berger cancelled the meeting of April 17, 1992, in retaliation for the filing of the first charge.[2]

On June 8, 1992, AFSCME and IDPA finally met to discuss the status of the Department's proposed budget. The budget was, at that time, still under consideration before the General Assembly. Although the parties reviewed the possibility of additional layoffs, the purpose of the meeting was not to undertake collective bargaining. Rather, IDPA only intended to provide AFSCME with information about the budget and to solicit AFSCME's assistance in certain lobbying efforts.

In any event, the Director of the Illinois State Labor Relations Board investigated AFSCME's charges against IDPA in accordance with section 11(a) of the Act and thereafter issued a complaint for hearing. (5 ILCS 315/11(a) (West 1992).) At the conclusion of the hearing, the hearing officer found, *inter alia*, that IDPA's decision to lay off employees was a mandatory subject of bargaining. He concluded, however, that AFSCME had waived its right to bargain over the layoffs by virtue of a provision in the parties' collective bargaining agreement.

Upon review, the Labor Board affirmed the hearing officer's findings and rulings in most respects, including the determination that AFSCME had contractually waived its right to collective bargaining. AFSCME thereafter appealed the decision and order of the Board directly to this court pursuant to section 11(e) of the Act. 5 ILCS 315/11(e) (West 1992).

AFSCME now contends that the Board erred in holding that AFSCME waived its right to bargain over the decision of the proposed layoffs. We disagree.

Initially, we note that the hearing officer found, among other things, that IDPA's decision to lay off employees was a mandatory

_____

[2]The hearing officer ultimately found that IDPA did in fact commit an unfair labor practice in S—CA—92—161. However, IDPA declined to file exceptions to the hearing officer's finding, and that finding has not been appealed.

subject of bargaining. For the reasons that follow, we hold that this finding was not against the manifest weight of the evidence.

■ Although IDPA is not obligated to bargain over all issues affecting its employees, a public employer nonetheless has a duty to negotiate with respect to wages, hours and conditions of employment, subject to certain statutory exceptions. In this regard, section 10(a)(4) of the Illinois Public Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit." (5 ILCS 315/10(a)(4) (West 1992).) The Act defines collective bargaining as "the performance of the mutual obligation of the public employer or his designated representative and the representative of the public employees to meet at reasonable times, including meetings in advance of the budget-making process, and to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act." 5 ILCS 315/7 (West 1992).

Section 4 of the Act excludes from the bargaining process matters of inherent managerial policy, including the overall budget, the organizational structure and the direction of employees. Nevertheless, section 4 qualifies this exception by reiterating that the employer must "bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives." 5 ILCS 315/4 (West 1992).

Thus, whether a public employer must bargain with the employees or their representative ordinarily depends upon whether the matter affects a condition of employment or an aspect of management. If the issue concerns the former, then the matter involves a mandatory subject of bargaining. If it involves the latter, then it does not.

Oftentimes, however, an issue affects both the conditions of employment and management's inherent authority. In such a "hybrid" situation, the determination of whether the employer must collectively bargain can only be resolved by weighing the benefits of bargaining with the burdens on management. *Central City Education Association v. Illinois Educational Labor Relations Board* (1992), 149 Ill. 2d 496, 523, 599 N.E.2d 892.

In *Central City*, two separate educational associations filed unfair labor charges with the Illinois Educational Labor Relations Board (IELRB). The first charge alleged that Central City School District No. 133 had unilaterally laid off four bargaining unit employees without bargaining in good faith. The second charge claimed that the LeRoy Community Unit School District No. 2 violated the Illinois

Educational Labor Relations Act by not bargaining over the development of a teacher's evaluation plan.

■ In a consolidated appeal, the Illinois Supreme Court considered whether the reduction in force or the implementation of the evaluation system constituted mandatory subjects of bargaining. After reviewing the legislative history, case law and the "experience" of the private sector, the court set forth a three-part test in determining what constitutes a mandatory subject of bargaining. The court stated in relevant part:

> "The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. *** If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.
>
> If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.
>
> At this point in the analysis, the IELRB should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve." (*Central City*, 149 Ill. 2d at 523.)

The court then remanded the causes for a hearing to determine whether the issues involved were mandatory subjects of bargaining pursuant to the three-part test.

In the instant case, the parties concede that the decision to lay off employees is a matter involving wages, hours and terms and conditions of employment. They likewise concede that it is also a matter involving inherent managerial authority. Thus, the hearing officer was required to, and did in fact, balance the benefits and burdens of bargaining.

Here, the hearing officer found that an economically motivated layoff decision based upon a lack of revenue is particularly amenable to collective bargaining. (See *Fibreboard Paper Products Corp. v. National Labor Relations Board* (1964), 379 U.S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398.) In support of this finding, the hearing officer cited *Central City School District 133* (1993), 9 Pub. Employee Rep. (Ill.) par. 1051, No. 87—CA—0018—S (IELRB February 10, 1993), for the proposition that "an exclusive bargaining representative, such as

[AFSCME], is in a position to offer alternatives which may address or alleviate the economic conditions leading to employee layoffs." He further noted that "[s]uch alternatives include restructuring the wage and benefit package of bargaining unit employees, foregoing wage increases and exploring options for early retirement or voluntary leave in order to avoid a layoff or limit the scope of the layoff."

As to the burdens imposed on management, the hearing officer dismissed as speculative IDPA's concern that bargaining over the issue at hand would lead to increased tensions between the parties. He similarly discounted IDPA's contention that the parties would likely reach a bargaining impasse, noting that it is not necessary for AFSCME to show that bargaining will result in a feasible solution.

In addition, the hearing officer rejected IDPA's suggestion that because the final approval of the layoff decision rests with the Illinois General Assembly, bargaining would be fruitless. As the hearing officer explained, "the only meaningful opportunity for collective bargaining over the layoff decision afforded [AFSCME] was with [IDPA] prior to the Governor's submission of [IDPA's] recommended budget to the General Assembly."

■ After reviewing the evidence in light of *Central City*, we affirm the hearing officer's finding that the decision to lay off employees was a mandatory subject of bargaining. In so doing, we recognize that the decision to lay off employees at issue in this case is inextricably connected with the terms and conditions of employment. Indeed, unlike other matters, such as the construction of new offices or the renovation of existing buildings, the decision to lay off employees strikes at the very heart of the employment relationship.

To be sure, we also recognize that the decision to lay off employees involves a matter of inherent managerial authority. The record here reflects that the RIF was motivated primarily, if not exclusively, by economic constraints resulting from a shortfall in IDPA's budget. As section 4 of the Act indicates, matters relating to the overall budget are peculiarly within the scope of managerial policy.

However, after weighing the benefits and burdens, it becomes clear that a decision to lay off employees due to a decrease in State funding truly invites the use of the collective bargaining process. As the hearing officer recognized, a bargaining representative is frequently in the best position to provide alternatives which may alleviate economic conditions and avoid employee layoffs. Not only is the representative authorized to negotiate on behalf of the employees, but he or she often possesses information which may not be available to management and which could influence management's decision to reduce its force.

Moreover, the purported burdens upon management, at least to the extent that they have been articulated in the record, are illusory at best. This is particularly true of IDPA's assertion that because budget decisions ultimately rest with the General Assembly, bargaining would be futile. If this were the case, then all matters contingent upon the approval of the budget which are otherwise subject to collective bargaining would be insulated from the bargaining process. Similarly, the possibility of increased tensions between the parties, or for that matter even an impasse, is not unique to negotiations over a reduction in force, but applies to any issue subject to bargaining.

For these reasons, we affirm the finding that IDPA's decision to lay off employees was a mandatory subject of bargaining.

■ We next observe that a party to a collective bargaining agreement may waive its rights to bargain under the Illinois Public Labor Relations Act where the contractual language evinces an unequivocal intent to relinquish such rights. (*Central City Education Association v. Illinois Educational Labor Relations Board* (1992), 149 Ill. 2d 496, 530, 599 N.E.2d 892; *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board* (1989), 190 Ill. App. 3d 259, 269, 546 N.E.2d 687.) However, "[e]vidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable." (*Village of Oak Park v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 7, 20, 522 N.E.2d 161, *appeal denied* (1988), 121 Ill. 2d 572, 526 N.E.2d 840, citing *International Union, United Automobile, Aerospace & Agricultural Implement Workers v. NLRB* (7th Cir. 1986), 802 F.2d 969, 973.) The language sustaining the waiver must be specific; waiver is never presumed.

■ In this case, we find that AFSCME has contractually waived its statutory right to bargain over the proposed layoffs pursuant to a collective bargaining agreement. The agreement, effective July 1, 1991, to June 30, 1994, set forth, *inter alia*, certain management rights. Specifically, article II, section 1, provides in part:

"[T]he Employer retains the exclusive right to manage its operations, determine its policies, budget and operations, the manner of exercise of its statutory functions and the direction of its working forces, including, but not limited to: The right to hire, promote, demote, transfer, evaluate, allocate and assign employees; *** to relieve employees from duty because of lack of work or other le-

gitimate reasons; [and] to determine the size and composition of the work force ***."[3]

We agree with the hearing officer that "[e]ven though the provision does not expressly refer to layoffs, there is no other way to read this language but as a clear and unequivocal intent by the parties to grant [IDPA] the sole authority to determine whether a layoff of bargaining unit personnel is necessary due to economic necessity." We find particularly persuasive the reservation of an *exclusive* right in favor of the employer "to relieve employees from duty because of lack of work or other legitimate reasons." The parties have, in effect, vested IDPA with the authority to unilaterally lay off employees for legitimate reasons as, for example, where the General Assembly decreases appropriations. As such, the contract reflects the requisite intent on the part of AFSCME to waive its right to collective bargaining over the issue at hand.

AFSCME, submits, however, that article II, section 2, of that same agreement negates the waiver of rights expressed in the aforementioned provision. This section provides that "Nothing in this Agreement shall be construed to modify, eliminate or detract from the statutory responsibilities and obligations of the Employer except that the exercise of its rights in the furtherance of such statutory obligations shall not be in conflict with the provisions of this Agreement."

The hearing officer rejected AFSCME's argument. He initially found section 2 to be ambiguous, noting that the first part of the provision appeared to obligate IDPA to bargain over mandatory subjects of bargaining, and yet the remainder of section 2 suggested that,

---

[3]The full text of article II, section 1, of the agreement provides:

"Section 1. Rights Residing in Management

Except as amended, changed or modified by this Agreement, the Employer retains the exclusive right to manage its operations, determine its policies, budget and operations, the manner of exercise of its statutory functions and the direction of its working forces, including, but not limited to: The right to hire, promote, demote, transfer, evaluate, allocate and assign employees; to discipline, suspend and discharge for just cause; to relieve employees from duty because of lack of work or other legitimate reasons; to determine the size and composition of the work force, to make and enforce reasonable rules of conduct and regulations; to determine the departments, divisions and sections and work to be performed therein; to determine the number of hours of work and shifts per workweek; to establish and change work schedules and assignments; to introduce new methods of operation; to eliminate, contract, and relocate or transfer work and maintain efficiency."

should the agreement conflict with the Act, the agreement controlled. The hearing officer nevertheless left the ambiguity unresolved because the record contained no extrinsic evidence as to the parties' intent concerning section 2. He held instead that section 2 was less specific than section 1, and therefore section 1 would be applied as written.

In affirming the hearing officer, the Board found section 2 of the agreement to be unambiguous. It further held that section 2 could be reconciled with section 1. The Board stated in pertinent part:

"In our view, it is clear that, given Section 1's clear reservation to [IDPA] of certain exclusive managerial rights, the term 'statutory responsibilities and obligations of the Employer' cannot reasonably be construed as referring to the duty to bargain under the Act, but instead is a reference to the Employer's overall statutory mission as a governmental body. In other words, whereas Section 1 of the management rights article attempts to delineate in the contract those decisions over which management retains sole and complete discretion and collective bargaining is not required, Section 2 of Article II attempts to reconcile the State's paramount responsibilities as a provider of public services with its duties toward the Union as a party to a labor contract."

Although we affirm the Board, we do not agree that sections 1 and 2 can be reconciled without doing violence to the language of the parties' agreement. Contrary to the Board, we find that the unrestricted phrase "statutory responsibilities and obligations of the Employer" contemplates more than just the "[e]mployer's overall statutory mission as a governmental body." Rather, the language can only be viewed as referring to, among other things, the employer's duty to bargain over issues affecting terms and conditions of employment as required by sections 4, 7 and 10 (a)(4) of the Illinois Public Labor Relations Act. Nothing in section 2 of the agreement suggests, even remotely, that by referring to the employer's statutory obligations, the parties intended to exclude those obligations arising under labor law. If that is in fact what the parties intended, they could have stated as much in their agreement.

We hold, however, that section 2 is internally inconsistent when viewed in the context of the entire collective bargaining agreement. Section 2 unequivocally states that nothing in the agreement shall be construed to modify IDPA's statutory obligations. And yet, section 1 of the agreement clearly modifies those statutory obligations, at least to the extent that it gives IDPA plenary and unilateral authority to reduce its force because of lack of work or other legitimate reasons. Such a RIF may be implemented without engaging in the otherwise statutorily mandated collective bargaining.

Nevertheless, although we find section 2 to be internally inconsistent when considering section 1, that it is not to say that section 2 is itself hopelessly ambiguous. Rather, it merely conflicts with another provision in the agreement, and such conflict may be resolved by resort to the laws of contract interpretation. Specifically, where two clauses conflict, courts must determine which of the two clauses more clearly expresses the chief objective of the contract. (*Harris Trust & Savings Bank v. Hirsch* (1983), 112 Ill. App. 3d 895, 900, 445 N.E.2d 1236.) Moreover, in construing a contract, courts must give effect to the more specific clause and, in so doing, should qualify or reject the more general clause as the specific clause makes necessary. See, *e.g.*, *McDonald's Corp. v. Butler Corp.* (1987), 158 Ill. App. 3d 902, 909, 511 N.E.2d 912, *appeal denied* (1987), 117 Ill. 2d 545, 517 N.E.2d 1087.

In this case, the hearing officer found, as we do, that the waiver of rights found in section 1 of the agreement was more specific than the negation of that waiver found in section 2. We also find that section 1, as written, more fully reflects the parties' intent with respect to the overall purpose of the collective bargaining agreement. That intent is reflected in the unambiguous language of section 1, vesting IDPA with the unilateral right to reduce its force for legitimate reasons. Indeed, such clauses have been included in similar labor agreements. See, *e.g.*, *Ador Corp. & Shopmen's Local 509, International Association of Bridge, Structural & Ornamental Ironworkers* (1965), 150 NLRB 161.

Finally, to accept AFSCME's interpretation of section 2 would render section 1 meaningless. Contracts should be read, however, so as to give effect to all provisions whenever possible. See, *e.g.*, *McDonald's Corp. v. Butler Corp.* (1987), 158 Ill. App. 3d 902, 909, 511 N.E.2d 912, *appeal denied* (1987), 117 Ill. 2d 545, 517 N.E.2d 1087.

For these reasons, the order of the Board upholding the decision of the hearing officer is affirmed.

Affirmed.

GORDON and McNULTY, JJ., concur.